IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No. 07-cv-02371-WYD-BNB

CITY OF AURORA, COLORADO, a municipal corporation, acting by and through its Utility Enterprise, Aurora Water,

    Plaintiff,

v.

PS SYSTEMS, INC., a Colorado corporation; and
RAR GROUP, LLC, a Colorado limited liability company,

    Defendants.

---

# ORDER

---

I.    <u>INTRODUCTION</u>

THIS MATTER comes before the Court on Defendants' Motion to Dismiss filed January 11, 2008. Defendants moves to dismiss Plaintiff's request for a declaratory judgment pursuant to FED. R. CIV. P. 12(b)(1) based on a lack of subject matter jurisdiction. For the reasons stated below, Defendants' Motion to Dismiss is denied.

II.    <u>FACTUAL BACKGROUND</u>

This is a declaratory judgment action by Plaintiff, City of Aurora, Colorado ["Aurora" or "the City"] in response to allegations that Aurora is infringing or will infringe two patents owned by Defendants PS Systems, Inc. ["PS Systems"] and RAR Group, LLC ["RAR"] [collectively "PS"] through use of the Aquifer Recharge and Recovery ["ARR"] component of Aurora's Prairie Waters Project ["the Project" or "Prairie Waters"]. Aurora seeks a declaratory judgment that the ARR component of the Project is not

infringing the two patents owned by PS, or a ruling that PS' patents are invalid and/or unenforceable.

By way of background, as a response to the statewide drought of 2002-2003 which caused Aurora's reservoir supply to drop below 30% capacity, Aurora began long-range planning for water supply and treatment. In 2004, Aurora began formal design and engineering studies for what would become the Prairie Waters Project. Aurora contends in its Complaint that when the Project is implemented in 2010, it will have the potential to increase the water supply available to the City's water supply by 10,000 acre-feet annually. (Compl. For Decl. Jud. Of Non-Infringement, Invalidity and/or Unenforceability, ¶ 8 [hereinafter "Compl."]) The Project essentially takes unpotable water from the South Platte River, stores the water underground and cleanses it, and then further treats the water for use by Aurora residents.

According to the Complaint, the Prairie Waters Project will allow Aurora to recover its fully reusable water rights diverted through alluvial well fields where water will be piped to three shallow infiltration ponds and will percolate by gravity into 40-60 foot deep native sands and gravel in an ARR facility. (*Id.*, ¶ 9). "The ARR will be surrounded by a low-permeability barrier: a discontinuous two-part slurry wall connected by grout walls which in combination will restrict groundwater movement into and out of the ARR facility." (*Id.*) Extraction walls located inside the low-permeability barrier will remove water that has migrated from the infiltration ponds through the sand and gravels, removing most of the organic, nutrient, phosphorous, and sedimentary elements from the water before it will be piped for additional treatment via a 35-mile pipeline to an advanced purification facility near the Aurora Reservoir. (*Id.*, ¶ 10.)

Stanley R. Peters ["Peters"], Randall R. Beeson, and Donald O. Summers ["Summers"] invented the subject matter of United States Patent No. 6,840,710 ["the 710 Pagent"] titled "Underground Alluvial Water Storage Reservoir and Method". The patent application for the 710 Patent was filed May 15, 2002, and the 710 Patent issued on May 11, 2005. Peters and Summers invented the subject matter of United Patent No. 7,192,218 [the "218 Patent"] titled "Direct Recharge Injection of Underground Water Reservoirs." The patent application for the 218 Patent was filed February 23, 2005, and the 218 Patent issued on March 20, 2007. The 710 Patent is assigned to Defendant RAR. PS Systems is the assignee of the 218 patent.

On November 2, 2005, counsel for PS Systems sent a letter to Aurora stating that the ARR system it was using as part of its Project may utilize certain technology covered by the 710 Patent. The letter stated:

> PS Systems would be pleased to work with the City to construct an underground reservoir as described in the '710 patent as part of the South Platte Project. Please contact representatives of PS Systems. . . to discuss potential collaboration or licensing possibilities. Alternatively, if you are of the opinion that you do not need a license from PS Systems, it would be helpful if you would contact the undersigned to provide some insight into your reasons.

(Defs.' Mot. to Dismiss, Ex. A).

By letter dated December 22, 2005, counsel for the City responded. (*Id.*, Ex. C. ) It stated in the letter that it was conducting an analysis and assessment of the ARR system and the relevance of the claims of the 710 Patent. Counsel anticipated that the review would be concluded by the end of January 2006 and that a substantive response would be provided at that time. (*Id.*) PS Systems asserts that it did not receive this letter until January 27, 2006.

On January 23, 2006, counsel for PS Systems sent the City a certified follow-up letter stating that input had been asked for on potential collaboration licensing possibilities with respect to the 710 Patent, that no response had been received to date, and that PS Systems would appreciate the City's response as soon as possible. (Defs.' Mot. to Dismiss, Ex. B.)

On September 22, 2006, another letter was sent to the City by counsel for PS Systems. (*Id.*, Ex. E.) It stated that since no response had yet been received concerning the 710 patent, it would be assumed that the City has no substantive response concerning the relevance of the claims of the 710 patent. That letter noted that in June 2006, the City filed for underground alluvial water storage and that in September 2006, the City began a bond offering process to fund the project. The letter concluded, "Given that the city is moving forward with this project, has furnished no substantive response concerning the relevance of the '710 patent, and is commencing the bond offering process, we again invite the City of Aurora to contact us to discuss project collaboration or a licensing agreement concerning the '710 patent." (*Id.*)

By letter of September 26, 2006, counsel for the City responded that it had not been able to provide a response in the timetable originally anticipated because the City's design of the Prairie Waters Project was not sufficiently developed. (Defs.' Mot. to Dismiss, Ex. E.) It further stated that the City was "now confident in the specific design of the System" and that it was anticipated a substantive response could be provided by October 13, 2006. (*Id.*)

By letter of October 13, 2006, counsel for the City stated that in response to PS Systems' letter of November 2, 2005, legal counsel had engaged in a review of the

City's ARR system which is to be developed as part of the Prairie Waters Project. (*Id.*, Ex. F.) The letter stated that the review had concluded that the system as currently designed did not infringe the 710 patent and that PS Systems' offer of a license thus did not appear necessary. It concluded, "If you believe that, notwithstanding the noninfringement opinion, you have information or argument that the City of Aurora should consider, then please contact me so that we can arrange a time to sit down and talk." (*Id.*) Aurora did not share its counsel's non-infringement opinion referenced in the letter with Defendants. PS Systems did not respond to this letter.

In January 2007, Defendants assert that Aurora's attorney left PS Systems' attorneys an unsolicited phone message stating that no response had been received to the October letter and asking if PS Systems wanted to sit down and talk. The message stated, "[t]he City of Aurora is open to hear what it is that they're interested in doing on a license basis" and that "[a]s I noted in the letter, the non-infringement opinion appears to make a license unnecessary, but with a project of this size the City of Aurora is open to sitting it down and trying to resolve the matter amicably." (Defs.' Mot. to Dismiss, Ex. G.) The message concluded that if PS Systems was interested in educating the City about what was wanted in a license, it should advise as to what the key terms of that license would be.

In February 2007, a meeting was held between the parties to discuss a license and, according to the City, a settlement of the infringement and licensing issues. Summers stated in his Declaration that he informed Aurora at that time of what PS Systems believed were fair licensing terms. (Summers Decl., ¶ 16.) He further stated that during the meeting, Aurora mentioned the possibility of litigation between the

parties, that this was the first mention of litigation, and that Aurora initiated it, not PS Systems. (*Id.*)

When the 218 Patent issued, counsel for PS Systems sent a letter to the City dated March 20, 2007. (Defs.' Mot. to Dismiss, Ex. G.) The letter reminded the City of PS Systems' November 2, 2005 letter notifying the City that its Project may utilize technology of the 710 Patent and advised the City that it also may be utilizing certain beneficial technology of the 218 Patent through its ARR system. The letter concluded, "PS Systems would be happy to work with the City to construct an underground reservoir as described in the '218 patent as part of the Prairie Water Project. Please contact us to discuss potential collaboration or licensing possibilities." (*Id.*)

Counsel for the City responded by letter dated March 23, 2007. (Defs.' Mot. to Dismiss, Ex. I.) The letter stated that the City was reviewing the 218 Patent's applicability to the Prairie Waters Project and would respond in due course "if the subject matter of this letter does not render that effort moot." (*Id.*) It further referenced the February meeting and stated that the letter was being provided in an effort to achieve resolution of the dispute between the clients pursuant to Rule 408 of the Federal Rules of Evidence. It stated that after reviewing the variety of settlement structures put forth by PS Systems, the City determined that a straight license with an upfront fee of $50,000 was the best way to proceed in the matter. The letter set forth specific terms for the license. It concluded that the license would enable PS Systems "to receive compensation for a technology that, at least in the case of the '710 patent, the City does not plan to use and without the risk of a finding of invalidity in any subsequent litigation with the City." (*Id.*)

By letter dated March 28, 2007, PS Systems stated that the "proposal of $50,000 for a license is unreasonable and therefore rejected". (Defs.'s Mot. to Dismiss, Ex. J.) The letter stated that the City's "offer presumes that it does not plan to use the technology recited in the claims of the '710 patent, but it has furnished PS Systems absolutely no factual, legal, or economic analysis of its position either under the patent or the '218 patent. Accordingly, PS Systems' position remains that the City is planning to use the technology recited in both the '710 patent and the '218 patent. If the City is interested in licensing the referenced patents on reasonable terms, please contact me." (*Id.*)

On June 4, 2007, Summers attended and spoke at an Aurora City Council meeting. (Summers Decl., ¶ 22.) While Summers states that he praised the Prairie Waters Project and stated that the Project enjoyed a cost savings advantage of over $375 million over other systems, he also stated at the meeting that some of the technology Aurora proposes to use is covered by the two patents issued to PS Systems. (*Id.*) He further stated at the meeting that he was not satisfied with the way Aurora's staff had handled its issues with PS Systems. (*Id.*) Aurora contends that by doing this PS Systems escalated the dispute between the parties by airing its allegations of Aurora's supposed infringement to the public.

By letter dated June 11, 2007, counsel for Aurora wrote that Summers' statements at the Aurora City Council session wherein Summers claimed that the City was "stealing" his company's technology as part of the Prairie Waters Project and that his company had not been treated fairly were "ironic and inflammatory in light of our notification to you that the City had obtained a written non-infringement opinion. . . and

your client's outright rejection of the City's offer to settle any dispute, notwithstanding, without making any kind of counteroffer whatsoever." (Defs.' Mot. to Dismiss, Ex. K.) The letter stated that "[i]t is impossible to explore the possibility of negotiating a resolution to our clients' differences if your client refuses to give any statement of what it demands from the City." (*Id.*) It further stated that "[t]he City remains willing to explore a resolution here and avoid any prospect of litigation down the road" even though the City assumes it is not using Defendants' technology. (*Id.*) It advised that as the City was moving forward on the Project, a response was needed by no later than June 29, 2007. The letter also indicated that while the 218 patent was still being evaluated, the City had a written non-infringement letter as to the 710 patent and had identified a number of invalidity arguments based upon the City's "prior art." (*Id.*) It also noted recent litigation where a patent was held to have been obtained by inequitable conduct of an attorney from PS Systems' counsel's firm, and stated that because of this, there was a likelihood of the firm being conflicted out of representing PS Systems in any litigation that occurs in the case. (*Id.*) Finally, the letter stated that PS Systems' failure to timely respond would confirm to the City that PS was not interested in a negotiated resolution of differences. (*Id.*)

On June 21, 2007, PS Systems sent a response to Aurora indicating that the City Council meeting had been videotaped and that Aurora had mischaracterized Summers' comments which were "measured and accurate" instead of ironic and inflammatory. (Defs.' Mot. to Dismiss, Ex. L; *see also* Summers Decl., ¶ 23.) The letter stated that Aurora had failed to furnish any evidence of non-infringement in the nearly two years since PS Systems had notified Aurora of the 710 patent and Aurora's proposed use of

PS Systems' patented technology and had instead "delayed and obfuscated every step of the way." (*Id.*) It stated that Aurora should share the non-infringement opinion and/or evidence of invalidity or cease licensing negotiations, and that Aurora is doing neither. Further, it stated that PS Systems had already provided reasonable licensing terms and that it was not going to bid against itself by making a counteroffer. Nevertheless, it stated that while $125.7 million is a reasonable royalty, PS Systems was willing to license the 710 patent for $1800 per acre-foot of water storage, subject to negotiation and to entering into a final, mutually acceptable, licensing agreement. It concluded that PS Systems is willing to engage in licensing agreements concerning the 218 patent "and the continuation application from the '710 patent once Aurora follows through on its promise to respond 'in due course, whatever that may be." (*Id.*)

Also on June 21, 2007, Aurora published its Preliminary Official Statement ["POS"] regarding the proposed issuance of over $420 million in water improvement revenue bonds for the Prairie Waters Project. (Defs.' Mot. to Dismiss, Ex. M.) The POS stated:

> A person claiming to hold a patent relating to an underground reservoir for storing water in alluvial deposits has alleged through his attorney that his patent is infringed by the proposed configuration of the ARR site and related structures at the North Campus, although no legal proceedings have been initiated to pursue such a claim. Based upon the advice of patent counsel, the City believes that it is unlikely that such a claim would be successful if asserted in a legal proceedings. In the event of an adverse resolution of this claim, it is possible that costs may be incurred in excess of those assumed in the current budget for the construction of the North Campus facilities. It is not currently anticipated that any resolution of the alleged patent claim will materially affect the timely completion or cost of the Prairie Waters Project.

(*Id.*)

On June 25, 2007, counsel for PS Systems sent a letter addressed both to bond counsel for Aurora and to underwriters' counsel for the bond issuance objecting to the City's disclosures regarding the PS patents in the POS, and setting out its position that a reasonable royalty would be $125.7 million for Aurora's alleged use of its technology. The letter stated that the POS was inaccurate with respect to the City's Disclosure of PS Systems' patents (as it failed to disclose the 218 patents) and as to Aurora's disclaimer of materiality. (Defs.' Mot. to Dismiss, Ex. N; *see also* Summers Decl., ¶ 26.) The City claims that this communication caused considerable turmoil in the context of the pending debt transaction.

Notwithstanding PS Systems' letters, the bonds issued without any change to the Statements in the POS. Further, the City contends that it broke ground on the Project in July 2007. (Peter D. Binney ["Binney"] Decl., ¶ 6, Ex. 1 to Pl.'s Resp. to Mot. to Dismiss.)

In early July 2007, Aurora provided PS Systems with design drawings for the ARR in order to allegedly demonstrate that the City would not infringe PS' patents. The drawings were marked "Preliminary Not for Construction." (Defs.' Mot. to Dismiss, Ex. Q.) Aurora asserts that those drawings have been supplemented by final design drawings. (Binney Decl., ¶ 3.)

By letter dated July 6, 2007, counsel for PS Systems wrote to Aurora indicating the letter was "written pursuant to F.R.E. and C.R.E. 408". (Defs.' Mot. to Dismiss, Ex. O.) It explained why PS Systems had written to Aurora's bond and underwriters' counsel, reiterated that $125.7 million was a reasonable royalty, and stated that did not replace the $1,800/acre-foot offer. (*Id.*) It further stated:

> In his June 11, 2007 letter, Bruce Plotkin referred to the possibility of litigation. PS Systems has never threatened the City with litigation. Nevertheless, the City should be aware that, in the event of litigation, its potential exposure for use of the '218 patent is $125.7 million.

(*Id.*) It also stated that the City's exposure for both the 710 and 218 patent was approximately $150 million to $160 million, and that PS Systems' offer of $1,800 per acre-foot "is a good bargain for a license to the '710 patent." (*Id.*) It concluded that PS Systems was available for a meeting to discuss licensing of the 710 patent, and that it eagerly awaited the City's response concerning the 218 patent. (*Id.*)

A meeting between the parties was held in late July, 2007. Summers states in his Declaration that he furnished Aurora with a reasonable royalty for the two patents, and that Aurora again mentioned the possibility of litigation. (Summers Decl., ¶ 30.) He further asserts that since Aurora had mentioned the possibility of litigation for the fourth time, PS Systems said at that meeting that if litigation occurred, then it would pursue the case to verdict. (*Id.*) PS asserts that it did not threaten litigation but was responding to the City's mentions of litigation. The City contends, on the other hand, that PS Systems demanded a minimum payment of $17 - $27 million in licensing fees, stated that the offer would not be left open indefinitely, and that if the City did not accept it, PS Systems "would be forced to litigate." (Binney Decl., ¶¶ 4-5.) The parties did not reach an agreement at that meeting.

Aurora then left a phone message for counsel for PS Systems that it was interested in mediation. A mediation was held on August 31, 2007. No resolution was reached, and Summers stated that Aurora left the mediation after several hours with no explanation of why the City was leaving.

The Complaint for Declaratory Judgment of Non-Infringement, Invalidity, and Unenforceability was filed on November 9, 2007. Preliminary construction plans for the Prairie Waters Project were given to pre-qualified bidders in July 2007. (Binney Decl., ¶ 7.) Construction plans for the ARR portion of the Project were finalized in October 2007 and ready-to-bid documents were transmitted to pre-qualified bidders in November of 2007. (*Id.*). As of January 31, 2008, the City indicated it had awarded contracts for the Project in the amount of $371,968,553. (*Id.*, ¶ 8.) In February 2008, the City expected to award another $68 million in contracts for the ARR. (*Id.*, ¶ 9.) The City plans to complete the Prairie Waters Project and begin its start-up process in the last quarter of 2010. (*Id.*, ¶ 10.)

III.  ANALYSIS

A.  Parties' Positions

Defendants contend that there is no case or controversy between the parties that merits declaratory judgment jurisdiction. That is because PS has been discussing its patents with Aurora for years – usually at Aurora's request. PS has never filed or threatened any litigation against Aurora because, to the best of PS' knowledge, Aurora has not built any system or practiced any method that has infringed its patents. Indeed, PS argues that Aurora's complaint admits that it will not build its Prairie Waters Project until 2010. Further, PS asserts that the plans for the Project are labeled "preliminary" and "not for construction." Accordingly, PS asserts that Aurora is simply asking for an advisory opinion and that the case should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Alternatively, it is argued that the Court should exercise its discretion to decline declaratory judgment jurisdiction because 1) a declaratory

judgment concerning Aurora's preliminary plans will not settle any controversy between the parties; and 2) Aurora's litigation is interfering with PS Systems' licensing negotiations with third parties.

Aurora contends, on the other hand, that there is a case or controversy of sufficient immediacy and reality to warrant declaratory judgment jurisdiction. It argues that Defendants' motion seeks to have the Court endorse their attempt to prolong the uncertainty they have cast over construction of Aurora's much-needed municipal water supply project. Further, the City argues that for over two years, Defendants have held a sword over its head, demanding that Aurora pay a licensing fee under patents which do not apply here. That attempt is unjustified under the facts and the law, and Aurora should be allowed to proceed with this action in order to resolve the underlying dispute.

Specifically, it is argued by the City that Defendants have identified the patents allegedly infringed, have made calculated licensing and royalty demands of up to $160 million for Aurora, continue to assert infringement, have actually threatened litigation and have rejected Aurora's continual denial of infringement. Aurora is faced with a choice of paying license fees PS does not deserve or abandoning the ARR part of its Project. Accordingly, the City argues that this Court should exercise its discretion and permit declaratory judgment jurisdiction in order to remedy Aurora's uncertainty of its rights with regard to the Project and PS' patents.

B. <u>Standard of Review</u>

A motion to dismiss under Rule 12(b)(1) can be either a facial attack on the sufficiency of the allegations of the complaint as to subject matter jurisdiction or a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v.*

*McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). In a factual attack, as here, the court may consider matters outside the pleadings and a motion to dismiss is not converted to a motion for summary judgment. *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). The court may not presume the truthfulness of the complaint's factual allegations. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Further, where the court's jurisdiction is contested, as in this case, the plaintiff has the burden of proving that jurisdiction exists. *AST Sports Science, Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008); *see also Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007).

    C.    <u>Whether A Sufficient Case or Controversy Exists</u>

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of an interested party seeking such declaration, whether or not further relief could be sought." 28 U.S.C. § 2201(a). The phrase "case or controversy" in the Act refers to the type of "cases" or controversies" that are justiciable under the Act. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).

According to the Supreme Court, "*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S. Ct. 764, 771 (2007). However, the dispute must "be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a

decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *Aetna*, 300 U.S. 240-241). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quotation omitted). The Supreme Court rejected the dissent's assertion that the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy. *Id.* at 771 n. 7.

According to the Federal Circuit, "[p]rior to MedImmune, our case law required that there be 'both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.'" *Benitec Australia*, 495 F.3d at 1343-44. "However, "[t]he Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.'" *Id.* at 1344 (quoting *SanDisk Corp. v. STMicroelectronics, NV*, 480 F.3d 1372, 1380 (Fed. Cir. 2007)).

The Federal Circuit has also indicated that *MedImmune* "articulated a more lenient legal standard' for the availability of declaratory judgment relief in patent cases'". *Cat Tech LLC. v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008) (quoting *Micron Tech, Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902-03 (Fed. Cir. 2008)). The issue of whether there has been meaningful preparation to conduct potentially infringing activity is an important element in determining whether a declaratory judgment is appropriate.

-15-

*Id*. "If a declaratory judgment plaintiff has not taken significant, concrete steps to conduct infringing activity, the dispute is neither "immediate" nor "real" and the requirements for justiciability have not been met." *Id*.

The Federal Circuit further explained:

A party may not "obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." . . . Thus, although a party need not have engaged in the actual manufacture or sale of a potentially infringing product to obtain a declaratory judgment of non-infringement, there must be a showing of "meaningful preparation" for making or using that product . . . .

*Id.* at 881 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988) and other cases). Jurisdiction may be met "where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *SanDisk Corp.*, 480 F.3d at 1381.

"A plaintiff need not 'bet the farm, or . . . risk treble damages . . . before seeking a declaration of its actively contested legal rights.'" *Cat Tech*, 528 F.3d at 883 (quoting *MedImmune*, 127 S. Ct. at 775). "The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights or risking prosecution-is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune*, 127 S. Ct. at 775 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152 (1967)).

In the case at hand, I find that Aurora has engaged in meaningful preparation for using the ARR system in the Prairie Waters Project and that it has taken concrete steps to begin conducting the alleged infringing activity involving the ARR system. That is because, construing the evidence in the light most favorable to Aurora as I must for purposes of this

motion, I find that Aurora has finalized its plans for the Project, issued over $420 million in water improvement revenue bonds for the Project, and broken ground on the construction of the Project in July 2007. Construction plans for the ARR portion of the Project were finalized in October 2007 and ready-to-bid documents were transmitted to qualified bidders in November 2007. Further, Aurora has awarded contracts on the Project in the amount of $371,968,553 and expected to award another $68 million in contracts for the ARR in February 2008. The Project is expected to be completed and begin its start-up process in 2010.

Also, Defendants took steps to inform the City of its patent and the alleged infringing activity, and engaged in negotiations for a licensing agreement. Finally, whether or not Defendants were the first to mention litigation, PS Systems advised Aurora that if its offer of a minimum payment of $17 to $27 million in licensing fees was not accepted, it would be "forced to litigate". Further, counsel for PS Systems sent Aurora a letter advising Aurora that "in the event of litigation", Aurora's exposure would be $150 to $160 million. I find that the foregoing conduct rises to the level of an Article III case or controversy. *See SanDisk Corp.*, 480 F.3d at 1381 ("[W]here a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights").

Defendants rely, however, on cases from the Federal Circuit which have held that there is not a sufficient case or controversy where the declaratory judgment plaintiff relied on infringing activity which was to occur in the future and where the dispute lacked

-17-

sufficient immediacy. For example, in *Benitec Australia*, the court affirmed the dismissal of a counterclaim where the party who sought declaratory relief had professed plans to engage in human gene-therapy treatment, but such activities could not be considered infringing until a new drug application ("NDA") was filed with FDA and the plaintiff, who sought relief in 2005, did not anticipate filing an NDA until "at least 2010-2012, if ever". *Id.*, 495 F.3d at 1346-50. Further, the plaintiff's activities consisted of developing and submitting only preliminary information to the FDA. *Id.*

Similarly, in *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir.1992), the court affirmed a dismissal of a defibrillator component manufacturer's claim for future patent infringement where clinical trials of the accused product had just begun and it was "years away" from potential FDA approval. Finally, in *Sierra Applied Sciences, Inc. v. Advanced Energy Indust., Inc.*, 363 F.3d 1361, 1379 (Fed. Cir. 2004), the court found that the immediacy requirement was not satisfied where the project at issue (the Billings 150 kw power supply) was at an early stage of development and the design may not be the one which was ultimately designed and produced. *See also Lang v. Pac. Marine & Supply Co.*, 895 F.2d 761, 764 (Fed. Cir. 1990) (the accused infringing ship hull would not be ready for at least nine months and the accused infringer had not distributed sales literature or engaged in any activity indicating that the ship would soon be ready).

I find those cases to be distinguishable. First, I find that in those cases the declaratory judgment plaintiffs had not engaged in the type of concrete steps to develop the alleged infringing product that the City has in this case. Further, it was uncertain in those cases when the declaratory plaintiff would engage in potentially infringing activity and whether the preliminary plans at issue would be the final design for the infringing activity.

In this case, however, Aurora asserts that the plans have been finalized, the construction has begun on the Project and there is a definite timetable for the Project to be operational. As the Federal Circuit explained in a recent case, "the technology involved in *Telectronics*, *Sierra* and *Benitec* . . .was fluid and in an early stage of development." *Cat Tech*, 528 F.3d at 882. Here, like in *Cat Tech*, the technology appears to be "'substantially fixed'". *Id*. Finally, I note that those cases were decided under the "reasonable apprehension" test which appears to be no longer valid in light of the more lenient standard articulated in *MedImmune*.

I conclude that Aurora has shown, under all the circumstances, "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *MedImmune*, 127 S. Ct. at 771. I further find that Aurora has shown that its activity in pursuing the ARR component of the Prairie Waters Project puts the City in the untenable position of either pursuing arguably illegal behavior or abandoning the ARR component of the Project altogether, despite the millions of dollars it has invested already. This is the classic dilemma that the Declaratory Judgment Act is meant to ameliorate.

Finally, I deny Defendants' alternative argument in their Motion to Dismiss that the Court should exercise its discretion to decline declaratory judgment jurisdiction. I find that jurisdiction should be exercised in order to remedy Aurora's uncertainty of its rights with regard to the Project and PS' patents, and in light of the millions of dollars that have already been expended by the City in connection with the Project.

IV. <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that Defendants' Motion to Dismiss (Doc. # 7 filed January 11, 2008) is **DENIED**.

Dated: September 19, 2008

              BY THE COURT:

              <u>s/ Wiley Y. Daniel</u>
              Wiley Y. Daniel
              U. S. District Judge