IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02371-PAB-BNB

CITY OF AURORA, COLORADO, a municipal corporation,
acting by and through its Utility Enterprise, Aurora Water,

      Plaintiff and Counterclaim Defendant,

and

GRIMM CONSTRUCTION COMPANY, INC.,
d/b/a Garney Construction, a Colorado corporation,

      Third-Party Defendant,

v.

PS SYSTEMS, INC., a Colorado corporation, and
RAR GROUP, LLC, a Colorado limited liability company,

      Defendants, Counterclaimants, and Third-Party Plaintiffs.
_____

## ORDER REGARDING CLAIM CONSTRUCTION
_____

      This patent case comes before the Court on plaintiff the City of Aurora's motions

for summary judgment [Docket Nos. 57, 59]. In connection with these motions, the

parties have submitted briefs and supporting evidence regarding the construction of

U.S. Patent No. 6,840,710 and U.S. Patent No. 7,192,218. Having reviewed the

submitted materials and because patent construction is conducted as a matter of law, I

now construe the patent claims as a preliminary matter. *Cf. Ballard Med. Prods. v.*

*Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("District courts

have wide latitude in how they conduct the proceedings before them, and there is

nothing unique about claim construction that requires the court to proceed according to

any particular protocol.  As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.").  For the time being, I withhold judgment on the questions of infringement which plaintiff raises in its motions for summary judgment. Those issues will be taken up at the hearing scheduled on that issue.

## I.  JURISDICTION

The Court exercises jurisdiction over this case under 28 U.S.C. § 1331 (federal-question jurisdiction) in conjunction with 28 U.S.C. § 1338(a) (district courts' original jurisdiction over patent cases).

## II.  BACKGROUND

### A.  Brief Factual Background

Defendants PS Systems, Inc. and RAR Group, LLC are the putative assignees of United States Patent No. 6,840,710 (the "'710 Patent") and U.S. Patent No. 7,192,218 (the "'218 Patent").  These patents describe structures and methods to be utilized in the storage of water in artificially constructed underground reservoirs.  The '710 Patent is entitled "Underground Alluvial Water Storage Reservoir and Method." The relevant portions of the patent abstract describe the subject matter as "[a]n underground reservoir for storing water in alluvial deposits utiliz[ing] slurry walls keyed to an aquiclude beneath the reservoir to form a substantially impermeable water seal." U.S. Patent No. 6,840,710 (filed May 15, 2002) (Abstract).  The '218 Patent is entitled "Direct Recharge Injection of Underground Water Reservoirs."  This patent's abstract describes the subject matter as "[a]n underground porosity water storage reservoir

[which] minimizes the impacts on surface uses of the reservoir site" and "a method of operating an underground porosity storage reservoir [which] minimizes damage to the reservoir due to injecting sediment-laden water or water that is chemically incompatible with the porous material in the underground reservoir." U.S. Patent No. 7,192,218 at 1 (Abstract) (filed Feb. 23, 2005).

In 2004, the City of Aurora began planning a large water supply and treatment project known as the Prairie Waters Project. The project includes a process by which wells draw water from an aquifer located near the banks of the South Platte River near Brighton, Colorado. These wells are positioned so that they take in water that has seeped down from the surface, thereby undergoing natural filtration as it passes through the alluvial soils. Under the plan, the water is transported from the wells to what is known as the Aquifer Recharge and Recovery component of the overall system. At the Aquifer Recharge and Recovery system, the water is placed into infiltration ponds and naturally percolates into the ground by force of gravity. The Aquifer Recharge and Recovery design includes a subterranean wall or walls encircling the area into which the water is placed. These walls are constructed mostly of a slurry mixture. However, two relatively small segments of the structure consist entirely of a grout material. Water placed in the Aquifer Recharge and Recovery system is then pumped out and moved off-site for purification, storage, and eventual use by the residents of Aurora. To date, the City of Aurora has completed construction of several parts of the Prairie Waters Project but has not begun construction of the Aquifer Recharge and Recovery portion.

## B.  Procedural History

Defendant patentees contend that the Aquifer Recharge and Recovery component of the Prairie Waters Project, as designed, infringes the '710 and '218 Patents.  When the parties were unable to resolve the dispute over the infringement of these patents on their own, the City filed a declaratory action in this Court on November 9, 2007.[1]  The complaint asserts five claims for declaratory relief against defendants PS Systems and RAR Group.  Claims one, two, and three seek declarations regarding the '710 Patent based on theories of non-infringement, invalidity, and unenforceability, respectively.  The fourth and fifth claims seek declarations regarding the '218 Patent based on theories of non-infringement and invalidity, respectively.  On October 3, 2008, PS Systems and RAR Group filed an answer which also asserted a counterclaim for infringement of the '710 and '218 Patents against the City of Aurora and a third-party claim for infringement of the same patents against Grimm Construction Company.[2]

On October 7, 2008, plaintiff the City of Aurora filed the two motions for summary judgment currently at issue.[3]  Contemporaneous with its motions, plaintiff filed two

---

[1] *See generally* Compl. for Declaratory J. of Non-infringement, Invalidity, and Unenforceability [Docket No. 1].

[2] *See generally*  Defs. and Counterclaimants' Answer & Countercl. [Docket No. 55].

[3] *See generally* Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 6,840,710 & Br. in Supp. of Same [Docket No. 57] ("Pl.'s '710 Patent Summ. J. Mot."); Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 7,192,218 & Br. in Supp. of Same [Docket No. 59] ("Pl.'s '218 Patent Summ. J. Mot.").

independent statements of undisputed facts in support thereof.[4]  Defendants responded

separately to the motions for summary judgment[5] and the statements of undisputed

facts.[6]  Finally, plaintiff filed separate replies to each of defendants' responses.[7]

Plaintiff's first motion for summary judgment puts at issue two of the three

independent claims of the '710 Patent, Claims 1 and 14.[8]  *See* Pl.'s '710 Patent Summ.

J. Mot. at 3-11.  Claim 1 describes the following invention:

---

[4] *See generally* Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 6,840,710 [Docket No. 56] ("SUDF Re: the '710 Patent"); Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 7,192,218 [Docket No. 58] ("SUDF Re: the '218 Patent").

[5] *See generally* Defs.' Resp. to Mot. for Summ. J. of Noninfringement of U.S. Patent No. 6,840,710 [Docket No. 66] ("Defs.' Resp. to '710 Patent Mot."); Defs.' Resp. to Mot. for Summ. J. of Noninfringement of U.S. Patent No. 7,192,218 [Docket No. 68] ("Defs.' Resp. to '218 Patent Mot.")

[6] *See generally* Defs.' Resp. to Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 6,840,710 [Docket No. 67] ("Defs.' Resp. to SUDF Re: the '710 Patent"); Defs.' Resp. to Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 7,192,218 [Docket No. 69] ("Defs.' Resp. to SUDF Re: the '218 Patent").

[7] *See generally* Reply to Defs.' Resp. to Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 6,840,710 [Docket No. 83]; Reply to Defs.' Resp. to Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 7,192,218 [Docket No. 81]; Reply to Resp. to Statement of Undisputed Facts in Supp. of Pl.'s Mots. for Summ. J. of Non-infringement of U.S. Patent Nos. 6,840,710 [Docket No. 84]; Reply to Defs.' Resp. to Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Summ. J. of Non-infringement of U.S. Patent No. 7,192,218 [Docket No. 82].

[8] While the City of Aurora's first motion for summary judgment initially challenged the '710 Patent's third independent claim, Claim 19, the parties have since stipulated that this claim is not at issue here.  As a result, the Court will not construe this claim. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.").

An underground reservoir for storing water in alluvial deposits comprising:

> a slurry wall defining a closed boundary for the underground reservoir, the slurry wall extending from a surface level to an aquiclude beneath the reservoir so that a bottom surface of the slurry wall is keyed into the aquiclude to form a substantially impermeable water seal between the slurry wall and the aquiclude; and

> a plurality of water extraction/recharge means distributed about the underground reservoir to provide for substantially even filling and draining operations of the underground reservoir.

'710 Patent col. 12 ll. 51-63.  The present controversy between the parties is limited to the paragraph which describes the reservoir boundary.

The second claim of the '710 Patent at issue here is a method claim, Claim 14, which describes:

> A method for storing water in underground alluvial deposits comprising the steps of:

> > constructing an underground slurry wall defining a closed boundary around the underground alluvial deposits, the slurry wall extending from a surface level to an aquiclude beneath the alluvial deposits so that a bottom surface of the slurry wall is keyed into the aquiclude to form a substantially impermeable water seal between the slurry wall and the aquiclude; and

> > alternately extracting and recharging the underground alluvial deposits with water.

'710 Patent col. 14 ll. 35-45.  The controversy over this claim also is limited to the paragraph which describes the construction of the reservoir boundary.

Plaintiff's second motion for summary judgment places into contention the two independent claims of the '218 Patent, Claim 1 and Claim 15.  *See generally* Pl.'s Mot. for Summ. J. of Non-Infringement of U.S. Patent No. 7,192,218 & Br. in Supp. of Same [Docket No. 59] ("Pl.'s '218 Patent Summ. J. Mot.").  Claim 1 describes:

6

A subsurface water storage system for receiving and storing substantially sediment-free water from a surface water body containing sediment-laden water, the subsurface water storage system comprising:

> an underground porosity storage reservoir storing water, the underground porosity storage reservoir including an underground vessel formed by one or more substantially water-impermeable, man-made barriers and an aquiclude, the vessel defining a volume such that the volume is substantially hydrologically separate from an environment exterior to the volume;

> at least one aquifer well coupled to the underground reservoir by piping, the at least one aquifer well being located in an aquifer that is hydrologically connected to the surface water body, each well having a wellhead; and

> a pump pumping water from the aquifer into the underground reservoir via the at least one aquifer well when water from the surface water body is available to be stored, the water substantially free of sediments found in the surface water body.

'218 Patent col. 14 l. 50 to col. 15 l. 3.

Claim 15 of the '218 Patent describes:

A subsurface water storage system for receiving and storing substantially sediment-free water from a surface water body containing sediment-laden water, the subsurface water storage system comprising:

> an underground porosity storage reservoir storing water, the underground porosity storage reservoir including an underground vessel formed by one or more substantially water-impermeable, man-made barriers and an aquiclude, the vessel defining a volume such that the volume is substantially hydrologically separate from an environment exterior to the volume;

> a reservoir well located in the underground porosity storage reservoir;

> an aquifer well located in an aquifer that is hydrologically connected to the surface water body; and

> a pump for transferring water from the aquifer well to the reservoir well when water from the surface water body is available to be

stored, wherein the water transferred from the aquifer is
substantially free of sediments found in the surface water body.

'218 Patent col. 16 ll. 19-39.  For purposes of the pending motion, the parties disagree

about the structures which Claims 1 and 15 disclose as being involved in the transport

of water from the aquifer to the reservoir.

## III.  ANALYSIS

### A.  Legal Standard – Patent Construction

"Determining whether a patent claim has been infringed requires a two-step

analysis: First, the claim must be properly construed to determine its scope and

meaning.  Second, the claim as properly construed must be compared to the accused

device . . . ."  *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1550 (Fed. Cir.

1997).  Claim construction is a question of law for the court.  *See Markman v. Westview

Instruments, Inc.*, 517 U.S. 370, 384, 391 (1996).

In construing patent claims, courts are guided by the precedent of the Federal

Circuit.  *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333

(Fed. Cir. 1999).  As that court has explained, "there is no magic formula or catechism

for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed.

Cir. 2005) (en banc).  Even so, the *Phillips* decision outlined several key sources and

doctrines that ought to be consulted and applied, all the while making clear that "[t]he

sequence of steps used by the judge in consulting various sources is not important;

what matters is for the court to attach the appropriate weight to be assigned to those

sources in light of the statutes and policies that inform patent law."  *Phillips*, 415 F.3d at

1324.

Courts begin with the "bedrock principle" that "'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The words of the claims "'are generally given their ordinary and customary meaning,'" *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *Phillips*, 415 F.3d at 1313. Sometimes, when the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and "the ordinary meaning . . . may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. However, when the claim terms have a particular meaning in the field, courts "look[ ] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). These sources include "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314.

Importantly, claim terms are not read in a vacuum. *Id.* at 1313. The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive. *Phillips*, 415 F.3d at 1314. In addition, the patent specification – the text and figures of the patent that precede the claims – "'is always

highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  Courts also consider the patent's prosecution history – the official record of the patent application and subsequent process before the U.S. Patent and Trademark Office.  *Phillips*, 415 F.3d at 1317.  That history "provides evidence of how the PTO and the inventor understood the patent."  *Phillips*, 415 F.3d at 1317.  However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.

Courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317.  However, this evidence is "'less significant than the intrinsic record,'" i.e., the specification and prosecution history.  *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  Courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence.  *Phillips*, 415 F.3d at 1318-19.  In other words, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Phillips*, 415 F.3d at 1319.

In sum, a court's basic role is to construe the claim terms as they would be viewed by "the ordinary artisan after reading the entire patent."  *Id.* at 1321.  This is crucial in order to respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the invented subject matter.  As the Supreme Court has stated, "[i]t seems to

> us that nothing can be more just and fair, both to the patentee and the
> public, than that the former should understand, and correctly describe, just
> what he has invented, and for what he claims a patent."

*Id.* at 1321 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876)).  The responsibility

of federal courts in construing patents flows from this same rationale: "The claim is a

statutory requirement, prescribed for the very purpose of making the patentee define

precisely what his invention is; and it is unjust to the public, as well as an evasion of the

law, to construe it in a manner different from the plain import of its terms."  *White v.

Dunbar*, 119 U.S. 47, 52 (1886).

### B.  U.S. Patent No. 6,840,710

The operative language in Claim 1 of the '710 Patent is the reference to "a slurry

wall defining a closed boundary for the underground reservoir."  U.S. Patent No.

6,840,710 col. 12 ll. 53-54 (filed May 15, 2002).  Claim 14 contains analogous

language: "an underground slurry wall defining a closed boundary around the

underground alluvial deposits."  '710 Patent col. 14 ll. 37-38.  The City of Aurora argues

that the Court should construe both claims to disclose "a single, uninterrupted slurry

wall that completely surrounds the underground reservoir (or alluvial deposits) in an

uninterrupted manner."  Pl.'s '710 Patent Summ. J. Mot. at 7.  Defendants urge the

Court instead to construe the claims to require "one or more slurry walls" which, in

conjunction with other potential structures, form some portion of the boundary enclosing

an underground reservoir.  Defs.' Resp. to '710 Patent Mot. at 5.

The dispute between the parties implicates two aspects of the claim language

that the Court must address.  First is the number of walls contemplated by the claims.

Second is the nature of the enclosure, that is, whether it must be contiguous and whether it must be made solely of a slurry wall or walls. With respect to the first issue, I agree with defendants that the claim language is not limited to a structure made of a single wall. Aurora argues that "it is notable and important that the claims recite the slurry walls in singular form: 'a slurry wall' (claim 1) and 'an underground slurry wall' (claim 14)." Pl.'s '710 Patent Summ. J. Mot. at 5. However, as is the case here, where a patentee uses the transitional phrase "comprising" in order to signify that a claim is open-ended, there is a presumption that the use of "a" or "an" in the claim means "one or more" of the modified term. *Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005). "Like the words 'a' and 'an,' the word 'the' is afforded the same presumptive meaning of 'one or more' when used with the transitional phrase 'comprising.'" *Free Motion Fitness, Inc.*, 423 F.3d at 1350-51. This presumption is overcome only when "the claim is specific as to the number of elements or when the patentee evinces a clear intent to limit the article." *Free Motion Fitness, Inc.*, 423 F.3d at 1350 (quotation marks and omission marks omitted).

Neither Claim 1 nor Claim 14 is specific as to the number of walls encompassed by the term "slurry wall," and the patent fails to evince a clear intent to be limited to a construction with a single slurry wall. In fact, the patent references both a single "slurry wall" and multiple "slurry walls." *Compare* '710 Patent col. 5 ll. 64, 67; col. 12 ll. 53-59; col. 13 ll. 57-58, 61-62, 65; col. 14 l. 27, 30, 37, 39, 41, 43, 50 (referring to a "slurry wall"), *with* '710 Patent at 1 (Abstract); col. 4 ll. 57, 66; col. 5 l. 16-17; col. 6, 12, 36, 47, 49, 58, 60, 64; col. 9 ll. 46, 67; col. 10 ll. 12-21 (referring to "slurry walls"). While these

references are not clear indications that Claims 1 and 14 disclose only multiple walls, they frustrate any attempt to rebut the presumption discussed in *Free Motion Fitness*. Therefore, I conclude that neither Claim 1 nor Claim 14 contains a limitation that the reservoir must consist of a single slurry wall. Instead, I construe those claims to include the limitation of "one or more slurry walls."

The analysis does not end there, however. The Court has established that the reservoir may consist of a single wall – for example, a circular structure with no corners – or it may consist of multiple walls – for example, a rectangular structure with multiple corners. In the context of the present dispute, however, the Court must also decide whether the structure must be continuous – that is, whether the wall or walls that make up the reservoir must be joined to one another – and of what materials the structure may be made.

According to the plain words of the claim, the boundary of the reservoir must be "closed." Furthermore, I find, and the parties appear to agree, that the patent only discloses reservoirs which are completely encircled by man-made structures. In other words, although the floor of the reservoir may consist of a natural barrier, none of the walls may. All expressions in the patent of the nature of the reservoir support this reading. *See, e.g.*, '710 Patent fig. 1 (below); '710 Patent col. 5 ll. 56-60 ("An underground reservoir **32** is preferably formed with a regular geometric boundary **34**, such as the rectangular boundary **34** shown in **FIG. 1**, so that the entire boundary **34** is contained within the property line **30**.").



FIG.1

Furthermore, one of the main stated purposes of the invention is to create an underground reservoir that is as close to hydrologically separate from the surrounding soil as is possible.  This allows the proprietors of the reservoirs both to keep their water in and to keep other people's water out.  For example, the patent explains that the underground reservoir uses "highly impermeable slurry walls to form the boundary of the reservoir."  '710 Patent col. 4 ll. 57-58.  Additionally, the patent describes the process by which "public water" is removed and isolated from the confines of the underground reservoir.  '710 Patent col. 7 ll. 7-41.  In fact, this isolation is so complete that the patent includes a means for transporting around the structure any naturally-

flowing, subterranean water in the surrounding area.  *See* '710 Patent col. 4 ll. 27-52.

The patent notes that this water often gets caught behind the outside walls on the high

side of the structure with nowhere to go.  Therefore, the water must be piped to the low

side of the structure in order to avoid disruptions in the natural hydrology of the area.

Based upon this discussion, I conclude that the '710 Patent requires that the reservoir

boundary be completely enclosed by man-made structures.

Being convinced of the enclosed nature of the underground reservoir boundary, I

now address the type or types of materials that may be used in the construction of that

boundary.  Claims 1 and 14 both describe the wall or walls as "slurry walls."  The only

means for enclosing the underground reservoir which is explicitly disclosed in the

specification of the '710 Patent is through the use of such slurry walls.  Under

"Summary of the Invention," the patent explains:

> In accordance with the present invention, the above and other problems
> are solved by an underground reservoir for storing water in alluvial deposits
> that is formed by a *slurry wall* extending from a surface level to an
> aquiclude (e.g., bedrock) beneath the reservoir so that a bottom surface of
> the *slurry wall* is keyed into the aquiclude to form a substantially
> impermeable water seal within the reservoir.

710 Patent col. 3 ll. 40-46 (emphases added).  The specification also states that:

> [i]n another embodiment of the present invention, a method for storing
> water in underground alluvial deposits includes the step of constructing *an
> underground slurry wall to surround the alluvial deposits* so that a bottom
> end of the slurry wall is keyed into an aquiclude running beneath the
> alluvial deposits, thereby forming a substantially impermeable water seal
> between the slurry wall and the aquiclude.

'710 Patent col. 4 ll. 13-19 (emphasis added).  The patent specification goes on to

explain that "[t]he great utility of the invention is the ability to create an efficient, cost

effective water reservoir without incurring the costs associated with traditional open

reservoirs.  The underground alluvial reservoir achieves this end through the use of *highly impermeable slurry walls to form the boundary of the reservoir . . . .*"  '710 Patent col. 4 ll. 53-58 (emphasis added).

Moreover, Claims 1 and 14 require that the slurry wall or walls "define" the boundary of the reservoir.  There is no indication that the word "define" takes on a unique meaning in the relevant art.  Instead, interpreting the word "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  In common parlance, "define," as the term is used Claims 1 and 14, means "to fix or mark the limits of."  Merriam-Webster's Collegiate Dictionary 327 (11th ed. 2007).  While the Federal Circuit cautions courts against undue reliance on dictionary definitions, it also recognized dictionaries' utility in claim construction where, as here, they are used "to assist in understanding the commonly understood meaning of words" and the definition is supported by the intrinsic evidence.  *See Phillips*, 415 F.3d at 1322-23.  The '710 Patent uses the term "define" in a similar manner in Claim 13: "the slurry wall *defines* an open boundary along one side of the underground reservoir . . . ."  '710 Patent col. 14 ll. 28-31 (emphasis added).  As this term is used in Claim 13, the slurry wall marks the limits of the open boundary between an underground reservoir and a more traditional open-water reservoir.  *Cf. Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("[O]ther claims of the patent can also be valuable sources of enlightenment as to the meaning of a claim term." (internal omission marks omitted)).  Accordingly, Claims 1 and 14 require that a slurry wall or walls fix or mark the limits of the boundary of the underground

reservoir.  Furthermore, because the patent describes the slurry wall as defining a

"closed boundary," the slurry wall or walls must adjoin one another for the full length of

the enclosure.

Defendant patentees contend that the "closed boundary" does not need to be

made entirely of slurry walls.  Rather they maintain that the patent contemplates a

"closed boundary" constructed of a combination of slurry walls and other man-made

materials.  In support of this position, defendants note that the specification explains

that "the slurry wall **36** may be formed in a variety of manners and with a variety of

materials."  Defs.' Resp. to '710 Patent Mot. at 9 (citing '710 Patent col. 6 ll. 3-4); *see*

*also* '710 Patent col. 6 ll. 66-67 to col. 7 ll. 1-2 ("The above description of slurry wall

construction techniques is not intended to be comprehensive as to either the different

techniques or materials that may be used in the formation of slurry walls . . . .").

Defendants also cite to the specification's reference to other materials that may be

incorporated into the slurry walls.  Defs.' Resp. to '710 Patent Mot. at 9-10.

Defendants are referring to the portion of the specification which states that

> the permeability of both the soil-bentonite and the cement-bentonite slurry
> walls may be improved by adding barriers during the trenching process
> and prior to forming the hardened slurry wall **36**.  These barriers typically
> comprise high density polyethylene or polyvinyl chloride sheets that are
> added to the slurry-filled trench either prior to the backfill step of the
> two-step soil-bentonite slurry wall process, or prior to the hardening of the
> cement-bentonite wall in the one-step cement-bentonite process.  The
> addition of such membranes or liners further enhances the impermeable
> nature of the slurry walls where necessary to prevent leakage.

'710 Patent col. 6 ll. 48-59.  The patentees' argument is unconvincing.  These excerpts

indicate only that *slurry* walls may be made in a variety of ways and from various types

of slurry. The excerpts do not refer to alternatives to slurry walls. The discussion regarding additional membranes does not change this fact. As the excerpt above makes clear, the liners being contemplated provide a barrier in addition to the slurry wall, they do not replace altogether a segment of the slurry wall. *See, e.g.*, '710 Patent col. 6 ll. 57-59 ("The addition of such membranes or liners *further enhances the impermeable nature of the slurry walls* where necessary to prevent leakage." (emphasis added)).

The patentees also argue that Claim 13, which is a dependent claim of Claim 1, indicates that the boundary of the reservoir as described in Claim 1 does not need to consist entirely of slurry walls. As discussed above, Claim 13 discloses a water storage structure which consists of a combination of an underground reservoir and a more traditional open-water reservoir. The description of this structure indicates that the slurry wall or walls surround only the underground reservoir, while the open reservoir is made impermeable through the use of a clay liner or similar material. *See* '710 Patent figs. 9, 10 (below); '710 Patent col. 11 l. 38 to col. 12 l. 11. The defendant patentees point to Claim 13 and its embodiments as evidence that at least Claim 1, and perhaps Claim 14, do not require slurry walls to surround the entire underground reservoir in an uninterrupted manner. The defendants infer this result from the fact that Claim 13, as a dependent claim, must contain all of the limitations of Claim 1. *See* 35 U.S.C. § 112 ¶ 4 (2006) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). Defendants argue that if the dependent claim, Claim 13, describes a reservoir that is not completely surrounded by slurry walls then the independent claim, Claim 1, should also be read to lack this limitation.

18



FIG.9

FIG.10

I disagree that Claim 13 requires such a result. All of the closed sides of the *underground* reservoir – which is the subject of Claim 1 – are made of a slurry wall or walls. Only the barriers of the open-water-reservoir portion of the combined structure consist of something else. Therefore, Claim 13 does not expand the plain language of Claims 1 and 14 so as to encompass walls which are not made of slurry.

19

Finally, defendant patentees' reference to industry literature will not alter the construction here. While extrinsic evidence such as this is "less significant than the intrinsic record in determining the legally operative meaning of claim language," it nonetheless "can shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation marks omitted). Defendants cite two engineering texts to argue that "a person of ordinary skill in the art understands that other materials may be added to or above a slurry wall, or to join slurry walls to provide strength or other functionality." Defs.' Resp. to '710 Patent Mot. at 11. Defendants' argument misses the mark. The question is not whether one skilled in the art would recognize that other materials may be used in conjunction with slurry walls. Instead, the question is whether one skilled in the art would understand the words of the '710 Patent, specifically "slurry wall defining a closed boundary," to include a wall that is not constructed, at least in part, of slurry. Contrary to defendants' contention, the cited literature does not suggest that a person of ordinary skill in the art would interpret the phrase "slurry wall" to include other types of walls. Rather, the literature demonstrates that, although other wall-types were known to be used in retention structures, the '710 Patent did not lay claim to those types of walls and, instead, focused entirely on the benefits of slurry walls.

In summary, while defendant patentees ask the Court to interpret Claims 1 and 14 to cover structures made mostly, but not entirely, of slurry walls, the Court cannot agree that the literal language of the claims permits such a result. In essence, defendants would like to interpret the clause "a slurry wall defining a closed boundary" to mean "a slurry wall *substantially* defining a closed boundary." However, as the discussion thus far demonstrates, the language of the patent forecloses such a

construction.  Therefore, the Court interprets the '710 Patent's reference to "a slurry wall defining a closed boundary for the underground reservoir" in Claim 1 and its reference to "an underground slurry wall defining a closed boundary around the underground alluvial deposits" in Claim 14 to exclude any structures, natural or man-made, that are not slurry walls.  As a result, the Court construes Claim 1 of the '710 Patent as requiring, among other things, that the underground reservoir for storing water in alluvial deposits be constructed of one or more slurry walls that completely surround the underground reservoir in an uninterrupted manner.  While there may be multiple walls – i.e., segments of the boundary that meet at corners – and other materials may be layered on top of a slurry wall, in order to directly infringe Claim 1 every wall must be made of slurry and must connect only to another slurry wall or other slurry walls.

The Court construes Claim 14 similarly, the only difference being that the construction is adjusted to accommodate the fact that Claim 14 is a method claim.  Therefore, Claim 14 of the '710 Patent requires, among other things, that the method for storing water in underground alluvial deposits employ one or more slurry walls that completely surround the underground reservoir in an uninterrupted manner.  Again, while this boundary may consist of multiple walls and may have other materials added to it, in order to directly infringe Claim 14 every wall must be made of slurry and must adjoin another slurry wall or other slurry walls.

### C. U.S. Patent No. 7,192,218

#### 1. Claim 1 of the '218 Patent

The City of Aurora's second motion for summary judgment addresses those portions of Claim 1 of the '218 Patent that deal with the connection between the aquifer well and the underground reservoir. The first focus is the limitation regarding "a pump pumping water from the aquifer into the underground reservoir via the at least one aquifer well . . . ." '218 Patent col. 14 ll. 66-67. The City of Aurora argues that this language should be interpreted as meaning: "pumping of alluvial water into injection wells and pumping between an aquifer and a reservoir well." Pl.'s '218 Patent Summ. J. Mot. at 3. Defendant PS Systems and RAR Group believe that the Court should construe this language to mean "a pump pumping water from the aquifer and introducing the water to the underground reservoir." Defs.' Resp. to '218 Patent Mot. at 3. The Court finds neither construction to be entirely compelling.

In support of its proposed construction, Aurora cites to the many references to reservoir wells and injection wells in the specification. However, because those phrases do not appear in Claim 1, the City of Aurora's construction requires the Court to import them into the claim language. Courts must be cautious about importing limitations into a claim from the specification. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). A court "may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, [only] when the claims themselves, the specification, or the prosecution history clearly indicate that the

invention encompasses no more than that confined structure or method." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

While it is true that the specification in the '218 Patent makes repeated mention of a reservoir well and injection of water into the underground man-made reservoir, *see, e.g.*, '218 Patent col. 3 ll. 13-14; col. 5 ll. 18-20, 37-38, 48-49; col. 6 ll. 1, 8-9, 23-35, 52, 56, these references are insufficient to import that limitation into Claim 1. Figure 2 of the patent shows an "extraction/injection well" labeled as "52," which is located in the reservoir. '218 Patent fig. 2 (below); *see* '218 Patent col. 5 l. 19. According to the patent, Figure 2 "illustrate[s] an exemplary underground reservoir system in accordance with the present invention." '218 Patent col. 4 ll. 11-12. "Although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (quoting *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (alteration marks omitted).



FIG.2

"Generally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction.'" *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). Here, none of the references in the specification constitute words or expressions of manifest exclusion or restriction sufficient to demonstrate the patentees' clear intention to limit the scope of Claim 1 to require a reservoir well. The references in the specification to reservoir wells could just as easily be referring to the explicit inclusion of a reservoir well in Claims 3, 13, and 15. '218 Patent col. 15 l. 15; col. 16 ll. 6, 31-32. In fact, because both Claims 3 and 13 are dependent claims of Claim 1, the doctrine of "claim differentiation" suggests that Claim 1 does not contain a reservoir well limitation.

"'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). The addition of a reservoir well in dependent claims 3 and 13, while not necessarily dispositive on the issue, *see Curtiss-Wright Flow Control Corp.*, 438 F.3d at 1381, nonetheless discourages the Court from reading a similar limitation into the independent claim, Claim 1. If nothing else, the explicit inclusion of reservoir wells in Claims 3, 13, and 15 contradicts any argument that the patentees clearly expressed their intent to limit Claim 1's scope to configurations with reservoir wells.

Finally, contrary to the City of Aurora's position, the prosecution history does not evince the patentees' intent to include such a limitation. Aurora is correct that in a letter to the patent examiner the patentees claimed that "the only commonality" between two

24

earlier patents and the '218 Patent application was that they all included "injection wells." *See* SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 8. However, it is not clear from this statement to what portions of the '218 Patent application the patentees were referring. Furthermore, their statement earlier in that same correspondence that "Independent claim 27 is similar to claim 1 but recites both an aquifer well and a reservoir well" undermines Aurora's contention that the patentees indicated that reservoir wells were present in all of the claims in the '218 Patent. *See* SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 7 (internal pagination at 6). Therefore, I construe Claim 1 as not requiring the limitation of a reservoir well. Because Claim 1 does not require any well to be placed in the underground man-made reservoir, the Court similarly rejects Aurora's attempt to include an "injection well" in that patent claim.

While the Court does not construe Claim 1 to include a reservoir well, that does not necessarily mean that the patentees are correct in assuming that Claim 1 encompasses passive, indirect methods of recharging the underground reservoir, such as gravity infiltration. There are examples in the relevant art of methods of inserting water directly into underground reservoirs without the use of a well. For example, the patentees' '710 Patent describes a configuration of perforated pipes which, particularly in shallow applications, could deliver water directly underground into the storage reservoir. '710 Patent figs. 5, 6; col. 8, ll. 33-61.

Although Claim 1 does not require a reservoir well, I conclude that it nonetheless requires an uninterrupted piped connection between the aquifer well and the underground reservoir. I further conclude that water must be actively moved along the

entirety of that connection through mechanical means.  I start my analysis with the words of the claim itself: "a pump pumping water from the aquifer into the underground reservoir via the at least one aquifer well . . . ."  '218 Patent col. 14 ll. 66-67.  First, "pumping" means to "raise or move a fluid with a pump."  Merriam-Webster's Collegiate Dictionary 1008 (11th ed. 2007).  The verb "pump," as in "pumping," connotes the active movement of a liquid from one location to another.  The inclusion of the noun "pump," as in "a *pump* pumping water," indicates that this movement is to be achieved through a mechanical device.  Therefore, Claim 1 of the '218 Patent requires the active movement of water from the aquifer well into the underground reservoir by means of a mechanical pump; gravity-driven movement is not contemplated.

Defendants argue that Claim 1 is potentially infringed if a party merely moves water to a location above the underground reservoir and then allows that water to seep down into the reservoir.  Such an interpretation misreads the word "into."  The plain language of this sentence instructs one to move water from the aquifer "into" the underground reservoir.  The claim's literal terms do not encompass moving the water "to," "near," or "onto" the underground reservoir.  While the patentees conceivably could have used these or other broad terms to describe a more indirect or passive connection to the reservoir, they did not.  The Court may not rewrite the claim now in order to alter or broaden its scope.  *Cf. Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) ("This court has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity.").

The patentees would like the Court to interpret the word "into" as "introduces."  In other words, the patentees argue that the patent's use of the phrase "into the underground reservoir" means something akin to delivery to the vicinity of the underground reservoir with the eventual passage to the reservoir possibly occurring passively and indirectly.  The Court finds this interpretation to be unconvincing for several reasons.  On the most basic level, the patentees problematically ask the Court to replace a relatively straightforward word, "into," with a considerably more ambiguous one, "introduces."  The defendant patentees arrive at their definition by way of a logically tortuous route.  First, they note that "[t]he preposition 'into' is simply 'used as a function word to indicate entry, *introduction*, insertion, superposition or inclusion' according to Webster's."  Defs.' Resp. to '218 Patent Mot. at 3, 5 (citing Merriam Webster's Collegiate Dictionary (11th ed. 2004) (emphasis in original)).  Keying into the word "introducing," the defendants then seek to utilize the word in its broadest possible sense.

Defendants do not explain why, of all the words listed in their definition of "into," the Court should settle on "introduction" to the exclusion of the others, such as "insertion."  The patent specification does, in one context, use the term "introduction":

> The embodiment of the underground reservoir **32** and transfer system **50** shown in FIGS. **1** and **2** also reduces fouling of the porosity storage material by preventing the *introduction* of chemically or physically incompatible water into the underground reservoir.  As discussed above, *introduction* of incompatible water into an underground reservoir can result in unexpected problems, such as chemical precipitation, clogging with sediments and undesirable biological growth, which are not an issue in a typical open storage reservoir.

27

'218 Patent col. 6 ll. 36-45 (emphases added).  Thus, the patentees used the term

"introduction" for a particular purpose but, where describing the means by which water

is placed into the reservoir, used "into" instead.  Even if the Court were to interpret the

term "into" in Claim 1 to mean "introduction," defendants would not realize the benefit

they seek.  While "introduction" may have multiple meanings, only one comports with

the context in which it would be used in the patent: "a putting in: insertion."  Merriam-

Webster's Collegiate Dictionary 657 (11th ed. 2007).  This meaning lacks the passive,

indirect character which defendants propose.  *Cf. Phillips*, 415 F.3d at 1322-23

("[J]udges . . . may . . . rely on dictionary definitions when construing claim terms, so

long as the dictionary definition does not contradict any definition found in or

ascertained by a reading of the patent documents" (quotation marks omitted)).

What seems to be at issue in the parties' dissection of "into" is whether the use

of an infiltration pond to recharge an underground reservoir would establish the

necessary link between the aquifer well and the reservoir.  I conclude that it would not.

This conclusion is reinforced by the other elements of Claim 1 which demonstrate that

the connection between the aquifer and the underground reservoir is to be achieved

through a mechanical piping system.  The second element of Claim 1 contains a

limitation that the patented system include "at least one aquifer well coupled to the

underground reservoir by piping."  '218 Patent col. 14 ll. 61-62.

The parties first disagree about the implications of the term "coupled."  The City

of Aurora insists that, in the context of this patent, the term "couple" signifies a direct

connection between the aquifer well and the underground water storage reservoir.

Defendant patentees, citing to a District of Delaware case, urge that the connection

may be direct or indirect and, in fact, may be so indirect as to encompass infiltration ditches and ponds above the underground reservoir. *See* Defs.' Resp. to '218 Patent Mot. at 3-4 (citing *Silicon Graphics, Inc. v. n Vidia Corp.*, 58 F. Supp. 2d 331, 345-47 (D. Del. 1999)).

Because I must construe patent terms according to their use in the patents, other courts' constructions of similar terms used in other patents may be of limited assistance. There are two cases, of which the Court is aware, which define the term "coupled." The case cited by defendants, *Silicon Graphics, Inc.*, held that "the ordinary meaning [of couple] in this context is 'coupled or connected, directly or indirectly.'" 58 F. Supp. 2d at 346. In *Bradford Co. v. ConTeyor North America, Inc.*, --- F.3d ----, 2010 WL 1711307, at *3, 6-7 (Fed. Cir. Apr. 29, 2010), the Federal Circuit recently held that the phrase "coupled to" means "linked together, connected or joined" and often deserves a broad construction to include indirect means of connection.

The distinction between a direct and an indirect connection, which was the focus in *Bradford* and *Silicon Graphics, Inc.*, is not particularly helpful in the present case. Both of those cases dealt with the question of whether two items would qualify as "coupled" if they were indirectly joined through a third, intermediary structure. *See Bradford Co.*, 2010 WL 1711307, at *7; *Silicon Graphics, Inc.*, 58 F. Supp. 2d 331, 345-46. Unlike the patents in *Bradford* or *Silicon Graphics*, Claim 1 of the '218 Patent identifies the specific means by which the two primary items – here, the aquifer and the underground reservoir – are to be coupled. Claim 1 explains that they are coupled "by piping." The specification makes clear that "piping" includes the entire mechanical

system of wells, wellheads, pumps, pump houses, valves, and pipe configurations.

Additional intermediary steps or diversions may well be contemplated under Claim 1.

However, one skilled in the art would not understand "piping," as the term is used in the

'218 Patent, to include infiltration ponds or infiltration ditches. Therefore, such

infiltration structures may not serve as the element which connects the underground

reservoir.

The parties debate whether and how the prosecution history should impact the

Court's reading of Claim 1 above. In describing the invention in the '218 Patent, the

patentees explained in a letter to the patent examiner that

> Claim 1 and new independent claim 27 each recite a subsurface water
> storage system for receiving and storing substantially sediment-free water
> from a surface water body that contains sediment-laden water. The
> system includes an underground porosity storage reservoir and an aquifer
> well that is connected to the reservoir by a pump. The aquifer well is
> positioned within an aquifer that is hydrologically connected to the surface
> water body so that water pumped from the aquifer well to the underground
> reservoir will be relatively free of any sediment (i.e., the water will have
> been naturally filtered by the alluvial deposits in the aquifer).

SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 7

(internal pagination at 6). The letter went on to explain that "[i]n this manner, the

underground porosity storage reservoir is not fouled by sediment as it is filled by water

taken directly from the surface water body (*e.g., through recharge ditches located

above the reservoir*)." SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to

Office Action) at 7, 12 (internal pagination at 6-7) (emphasis added). The implication of

the parenthetical statement in this final sentence is that the underground porosity

storage reservoir may be filled by water through recharge ditches located above the

reservoir.

30

At the same time, the prosecution history – the same letter, in fact – also discredits recharge through such passive, indirect means.  The patent examiner initially rejected Claim 1 on the grounds that it was obvious in light of the '710 and other patents.  *See* SUDF Re: the '218 Patent, ex. 11 (Office Action Letter) at 4.  In distinguishing their new application, the patentees explained that the '710 Patent "mentions that un-pressurized (gravity) methods of filling the reservoir may include forming a series of open ponds or recharge ditches on the surface over the reservoir to disperse the recharge water directly on top of the underground reservoir."  SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 12 (internal pagination at 7).  The patentees also stated that "the '710 patent describes surface features such as ponds or recharge ditches which would prevent alternative uses for the land above the underground reservoir."  SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 12 (internal pagination at 7).  The patentees then explained that "[i]ndeed, these same shortcomings of the '710 patent were pointed out in the Background of the present application."  SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 12 (internal pagination at 7).  Finally, the patentees noted that "the present invention relates to the provision of substantially sediment-free water to the underground reservoir in a manner that does not prohibit the use or enjoyment of the land above the reservoir."  SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 10.  The City of Aurora claims that under the doctrine of prosecution disclaimer this series of statements prevents infiltration means of recharge from being read into the patent.

"The doctrine of prosecution disclaimer protects the public's reliance on definitive statements made during prosecution by precluding patentees from recapturing through claim interpretation specific meanings clearly and unmistakably disclaimed during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008) (quotation marks and alteration marks omitted). "Claims should not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Computer Docking Station Corp.*, 519 at 1375 (quotation marks omitted).

Through some of the language of the letter cited above, the patentees certainly insinuated that they were disclaiming the use of un-pressurized (gravity) methods of filling the reservoir such as open ponds and recharge ditches whose necessary disturbance of the surface area above the underground aquifer would prevent alternative uses of that land. However, it cannot be said that the patentees clearly and unmistakably disclaimed such subject matter, especially in light of the parenthetical reference to filling an underground porosity reservoir through "recharge ditches located above the reservoir." Therefore, the doctrine of prosecution disclaimer does not apply and the letter cited above provides little guidance either way regarding the potential coverage under the '218 Patent of passive, indirect means of recharging the underground reservoir such as infiltration.

On another point that implicates the prosecution history, the patentees note that the specification of the '218 Patent makes specific mention of passive, gravity-driven recharge methods:

Storing operation **408** may involve extracting the water from the extraction point **64** (if not already extracted such as in treatment operation **414**), transporting it, and injecting the compatible water into the underground reservoir **32**. This may involve the use of one or more pumps *or may simply involve allowing water to flow by gravity from the extraction point to the underground reservoir*. The water may be injected via a well **52** or may be injected above the water level **40** of the underground reservoir and allowed to infiltrate down to the water level **40** over time. *Alternatively, the water to be stored in the underground reservoir may be temporarily stored in an infiltration pond (not shown in FIGS.* **1** *and* 2*) and allowed to infiltrate from the pond through the surface to the underground reservoir* **32***.*

'218 Patent col. 10 ll. 43-56 (emphases added). This is the only passage in the patent which makes any reference to the use of infiltration. In fact, the patent's mention of infiltration is so at odds with the remainder of the patent that it almost seems out of place.

The '218 Patent does, at times, use somewhat vague language, such as "transfer," to describe the movement of water. *See, e.g.*, '218 Patent fig. 3; col. 6 ll. 9-11. However, all of the descriptions of specific transfer methods are of the active, forceful movement of water to an underground location in the reservoir. For example, the patent is replete with references to the "injection" of water into the underground reservoir. *See, e.g.*, '218 Patent at 1 (Abstract); col. 2 ll. 17-19, 30; col. 3 ll. 13-14; col. 5 ll. 19, 22, 37-38, 51-53, 59-60 col. 7 ll. 42-44, 61-63. Indeed, the patent is entitled: "*Direct recharge injection* of underground water reservoirs." Although patent titles generally are afforded almost no weight in the construction of patent claims, *see Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1312-13 (Fed. Cir. 1999), the Court need not ignore the title entirely when it reinforces the Court's understanding of

the patent language.  *See United Techs. Corp. v. PerkinElmer, Inc.*, 537 F. Supp. 2d 392, 403 n.7 (D. Conn. 2008).

The use of infiltration ditches and ponds also is at odds with one of the key purported benefits of the '218 Patent: the preservation of that land for other uses.  *See* '218 Patent col. 1 ll. 61-63; col. 4 ll. 3-7; col. 5 ll. 9-14; col. 6 ll.17-18, 61-62; col. 7 ll. 29-33; *see also* SUDF Re: the '218 Patent, ex. 12 (Amendment and Response to Office Action) at 12 (internal pagination at 7).  Incorporating infiltration ditches and ponds into the design would eliminate large swaths of land above the reservoir and negate that stated benefit.  Courts "normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (citing cases).  However, the '218 Patent specification's singular reference to an infiltration pond, which stands in direct contrast to the remaining language of the patent, will not by itself expand the ordinary and customary meaning of the phrase "a pump pumping water from the aquifer into the underground reservoir" to include methods of infiltration.  *Cf. White v. Dunbar*, 119 U.S. 47, 52 (1886) ("The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.").

The passage from the '218 Patent describing an infiltration pond also appears to have limited application to Claim 1 specifically.  The City of Aurora claims that the reference is subject matter disclosed, but not claimed, by the patentees.  The Federal Circuit has explained that "subject matter disclosed but not claimed in a patent

34

application is dedicated to the public."  *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562-63 (Fed. Cir. 1991) (citing *Edward Miller & Co. v. Bridgeport Brass Co.*, 104 U.S. 350, 352 (1881)).  In other words, "disclosed embodiments may be within the scope of other allowed but unasserted claims."  *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008).  Generally, however, courts only "have interpreted claims to exclude embodiments of the patented invention where those embodiments are clearly disclaimed in the specification or prosecution history."  *Oatey Co.*, 514 F.3d at 1277  (citations omitted).  For example, where an applicant during prosecution of the patent has "cancelled pending claims but not amended the specification to delete disclosure relevant only to the cancelled claims . . . unasserted or cancelled claims may provide 'probative evidence' that an embodiment is not within the scope of an asserted claim."  *PSN Illinois, LLC*, 525 F.3d at 1166.

The excerpt describing an infiltration pond is part of the detailed description of Figure 4 of the patent.  According to the description, Figure 4 "illustrates an embodiment of a *method* **400** for extracting water from a surface water body system, such as a river system, and storing the water in an underground porosity reservoir that reduces the potential for fouling of the reservoir due to sediments in the water to be stored."  '218 Patent col. 8 ll. 25-29 (emphasis added); *see also* '218 Patent fig. 4 (below).  The "storing operation," denoted as item **408** in Figure 4, is the end result of the broader method for extracting and storing water as embodied in Figure 4.



**FIG. 4**

While these descriptions both supposedly describe methods, none of the claims in the '218 Patent, including Claim 1, purport to be method claims. These references are apparently holdovers from the original patent application which included twelve method claims – Claim 9 through 20. *See* U.S. Patent Application 11/064,548, Pub. No. US 2005/0186030 A1 (filed Feb. 23, 2005) at 8-9. These method claims track closely with the embodiments in Figure 4 and the associated specification language. By a letter dated April 17, 2006, the patentees cancelled all of the method claims in their application – Claims 9 through 20. *See* Remarks (Apr. 17, 2006), available at http://portal.uspto.gov/external/portal/pair; *see also* SUDF Re: the '218 Patent, ex. 11

(Office Action Letter) at 3 (noting the cancellation).  However, the patentees did not amend their application to remove the method language in the specification.

It appears that at least some of the twelve method claims were incorporated in some form into a new product claim, so the language has not been rendered altogether irrelevant.  *Compare, e.g.*, U.S. Patent Application 11/064,548 at 8-9 (Claims 9 through 19), *with* '218 Patent col. 15 l. 41 to col. 16 l. 3.  However, the original patent application does provide important context in determining how to incorporate the specification's discussion of the infiltration pond and gravity-driven recharge.  The storage operation, as part of the broader method for extracting and storing water, was addressed most directly in former Claim 9 of the original patent application:

> A method for storing water in an underground reservoir filled with a porous material, the underground storage reservoir including an underground vessel formed by one or more substantially water-impermeable, man-made barriers and an aquiclude, the vessel defining a volume such that the volume is substantially hydrologically separate from an environment exterior to the volume, the method comprising:
>
> > (a) accessing a first subsurface body of water outside of the underground reservoir;
> >
> > (b) determining if the first body of water is compatible with the material in the underground reservoir; and
> >
> > (c) if the first body of subsurface water is determined to be compatible, extracting water from the first body of water and injecting the extracted water into the underground reservoir.

U.S. Patent Application 11/064,548 at 8; *see also* U.S. Patent Application 11/064,548 at 9 (Claims 12 and 17).  No claim which correlates to Claim 9 in the original application survived to make it into the '218 Patent.

Furthermore, Claim 1 of the '218 Patent did not replace former Claim 9 of the application; the original patent application contained a Claim 1 which is identical to Claim 1 in the '218 Patent. Therefore, the Court perceives no reason to project the embodiments of what was Claim 9 onto Claim 1 now. Because the embodiments in the specification regarding passive, gravity-driven recharge methods pertained to claims which were dropped during the prosecution of the '218 Patent, those embodiments as referenced in the excerpt above are not sufficient to alter the Court's interpretation of Claim 1. It appears that from the beginning of the application process, the patentees intended Claim 1 to disclose the active, mechanical movement of water between an aquifer well and an underground reservoir by way of an uninterrupted, piped connection. In relation to Claim 1, at no point has there been a reference to passive, above-ground, gravity-driven methods of recharge such as infiltration ponds.

Therefore, for purposes of the motion before the Court, the Court concludes that the '218 Patent's claims, specification, and prosecution history justify the following interpretation of Claim 1. Claim 1 contains the following elements: 1) An underground porosity storage reservoir, as described in the patent; 2) at least one aquifer well, as described in the patent, that is linked together, connected, or joined to the underground reservoir by way of an uninterrupted piping system that extends into the underground reservoir – the connection with the reservoir may be, but need not be, through a reservoir well; and 3) a mechanical device, i.e., pump, which actively moves the water described in the patent along the entirety of the connection between the aquifer well and the underground reservoir.

### 2. *Claim 15 of the '218 Patent*

Relevant to the present dispute, the construction of Claim 15 of the '218 Patent must address the following elements:

> a reservoir well located in the underground porosity storage reservoir;
>
> an aquifer well located in an aquifer that is hydrologically connected to the surface water body; and
>
> a pump for transferring water from the aquifer well to the reservoir well when water from the surface water body is available to be stored, wherein the water transferred from the aquifer is substantially free of sediments found in the surface water body.

'218 Patent col. 16 ll. 31-39. The City of Aurora argues that "[t]he language should be interpreted to mean: 'a pump that is coupled to an aquifer well located in an aquifer and also coupled to a reservoir well located in an underground porosity storage reservoir, wherein the wells are holes or shafts sunk into the earth allowing access to subsurface water.'" Pl.'s '218 Patent Summ. J. Mot. at 6. The defendant patentees contend that "[t]he disputed term from claim 15, 'a pump for transferring water from the aquifer well to the reservoir well' should be construed as: . . . 'a pump for transferring water from the aquifer well directly or indirectly to the reservoir well.'" Defs.' Resp. to '218 Patent Mot. at 12.

The disagreement with respect to this claim boils down to whether Claim 15 requires an injection well that is directly connected to the aquifer well or whether the presence of any well in the underground reservoir will suffice. Under the patentees' proposed construction, the fourth element of Claim 15 – a pump for transferring water from the aquifer well to the reservoir well – would be met by a system which pumps water from the aquifer well to the vicinity of an extraction well that removes water from

39

the underground reservoir. In other words, the defendants assert that the preposition "to" only necessitates that the water begin at the aquifer well and eventually end up at an extraction well without requiring a direct connection between the two. The defendants claim that it is permissible under the claim language for the water to first travel through intermediary structures such as an infiltration pond and the alluvial deposits above or in the underground reservoir.

The plain language of Claim 15 is somewhat ambiguous. On the one hand, transferring water "to" the reservoir well could require a direct path, especially if the well being referenced is an injection well. On the other hand, this language could reasonably be read to require nothing more than transferring the water to the vicinity of an injection or extraction well located in the reservoir.

In order to resolve this ambiguity, I look to what has been considered the most useful source in interpreting claim language, the specification. *See Phillips*, 415 F.3d at 1315. First, I note that the '218 Patent provides its own definition of the word "well." *See Phillips*, 415 F.3d at 1316 ([T]he inventor's lexicography governs."). According to the patent, a "well" is "[a]n extraction/injection well [which] is a hole or shaft sunk into the earth, usually vertically, allowing access to subsurface water and, in a preferred embodiment, includes a section of PVC or metal pipe extending substantially vertically down to a depth below surface." '218 Patent col. 5 ll. 22-26.

The specification demonstrates that a person of ordinary skill in the art would understand that where the transferring of water from an aquifer well to a reservoir well is contemplated in this patent, the connection is between an extraction well in the aquifer and an injection well in the reservoir. As discussed above in the context of

40

Claim 1 of the '218 Patent, the specification discusses the injection of water into underground reservoirs. Figures 2 and 6 clearly demonstrate that there is a correlation between the wells – i.e, one extracts and the other injects. The Court agrees that a person of ordinary skill in the art would not read the patent to require the exact simplified illustration in Figures 2 and 6, with a direct path from well to well. Indeed, the specification discusses any number of intermediary steps between extraction and injection. *See, e.g.*, '218 Patent col. 9 l. 60 to col. 10 l. 28. However, the patent is clear that in systems which incorporate an aquifer well and a reservoir well and that include the transfer of water from the former to the latter, the reservoir well is used for injecting the water into the underground reservoir. *See, e.g.*, '218 Patent col. 3 ll. 11-14 ("If the first body of subsurface water is determined to be compatible, water is extracted from the first body of water and injecting [sic] the extracted water into the underground reservoir."); col. 5 l. 48-53; *see also* col. 8 l. 12-15; col. 9 l. 60 to col. 10 l. 28.

The specification indicates that, in a preferred embodiment of the "transfer system," both the reservoir well and the aquifer well would serve dual roles as extraction and injection wells, thereby allowing for the flow of water in either direction. '218 Patent col. 5 ll. 38-40. A person of ordinary skill in the art would understand that under this formulation the wells would work in tandem. As one extracted water, the other would inject it. Therefore, in the scenario presented by Claim 15, a transfer from the aquifer to the reservoir, the aquifer well would serve as an extraction well and the reservoir well would serve as an injection well. To the contrary, nowhere in the patent is the patentees' proposed construction evident. There is no discussion of a possible

configuration of the invention under which both the aquifer and the reservoir well would simultaneously serve as extraction wells in transferring water from the aquifer.

While the Court must be careful not to improperly import limitations from the specification, the Court believes that the present reliance on the specification lies on the proper side of the line between construing terms and importing limitations. *Cf. Phillips*, 415 F.3d at 1323 ("[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."). Therefore, the Court construes Claim 15 of the '218 Patent to require: an underground porosity storage reservoir as described in the patent; a reservoir injection well (which may also serve as an extraction well) located in the underground porosity storage reservoir; an aquifer extraction well (which may also serve as an injection well) located in an aquifer that is hydrologically connected to the surface water body; and a pump for transferring water from the aquifer extraction well to the reservoir injection well when water from the surface water body is available to be stored, wherein the water transferred from the aquifer is substantially free of sediments found in the surface water body.

## IV. CONCLUSION

Accordingly, the patent claims presently at issue shall be construed as follows:

**Claim 1 of the '710 Patent:**

An underground reservoir for storing water in alluvial deposits comprising:

1)    an uninterrupted slurry wall or walls defining the entirety of a closed boundary for the underground reservoir, the slurry wall or walls extending

42

from a surface level to an aquiclude beneath the reservoir so that a bottom surface of the slurry wall or walls is keyed into the aquiclude to form a substantially impermeable water seal between the slurry wall or walls and the aquiclude; and

2)      a plurality of water extraction/recharge means distributed about the underground reservoir to provide for substantially even filling and draining operations of the underground reservoir.

**Claim 14 of the '710 Patent:**

A method for storing water in underground alluvial deposits comprising the steps of:

1)      constructing uninterrupted, underground slurry wall or walls defining the entirety of a closed boundary around the underground alluvial deposits, the slurry wall or walls extending from a surface level to an aquiclude beneath the alluvial deposits so that a bottom surface of the slurry wall or walls is keyed into the aquiclude to form a substantially impermeable water seal between the slurry wall or walls and the aquiclude; and

2)      alternately extracting and recharging the underground alluvial deposits with water.


**Claim 1 of the '218 Patent:**

A subsurface water storage system for receiving and storing substantially sediment-free water from a surface water body containing sediment-laden water, the subsurface water storage system comprising:

1)      an underground porosity storage reservoir storing water, the underground porosity storage reservoir including an underground vessel formed by one or more substantially water-impermeable, man-made barriers and an aquiclude, the vessel defining a volume such that the volume is substantially hydrologically separate from an environment exterior to the volume;

2)      at least one aquifer well linked together, connected, or joined to the underground reservoir by way of an uninterrupted piping system that extends into the underground reservoir – the connection with the reservoir need not be through a reservoir well – the at least one aquifer well being located in an aquifer that is hydrologically connected to the surface water body, each well having a wellhead; and

43

3)    a mechanical device, i.e., pump, which actively moves water along the entirety of the connection between the aquifer and the underground reservoir via the at least one aquifer well when water from the surface water body is available to be stored, the water being substantially free of sediments found in the surface water body.

**Claim 15 of the '218 Patent:**

A subsurface water storage system for receiving and storing substantially sediment-free water from a surface water body containing sediment-laden water, the subsurface water storage system comprising:

1)    an underground porosity storage reservoir storing water, the underground porosity storage reservoir including an underground vessel formed by one or more substantially water-impermeable, man-made barriers and an aquiclude, the vessel defining a volume such that the volume is substantially hydrologically separate from an environment exterior to the volume;

2)    a reservoir injection well located in the underground porosity storage reservoir;

3)    an aquifer extraction well located in an aquifer that is hydrologically connected to the surface water body; and

4)    a pump for transferring water from the aquifer extraction well to the reservoir injection well when water from the surface water body is available to be stored, wherein the water transferred from the aquifer is substantially free of sediments found in the surface water body.

It is so **ORDERED**.

DATED June 2, 2010.

                              BY THE COURT:


                              s/Philip A. Brimmer
                              PHILIP A. BRIMMER
                              United States District Judge