IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02371-PAB-BNB

CITY OF AURORA, COLORADO, a municipal corporation,
acting by and through its Utility Enterprise, Aurora Water,

      Plaintiff and Counterclaim Defendant,

and

GRIMM CONSTRUCTION COMPANY, INC.,
d/b/a Garney Construction, a Colorado corporation,

      Third-Party Defendant,

v.

PS SYSTEMS, INC., a Colorado corporation, and
RAR GROUP, LLC, a Colorado limited liability company,

      Defendants, Counterclaimants, and Third-Party Plaintiffs.
_____

**ORDER**
_____

      This patent case comes before the Court on the motion to dismiss for lack of

subject-matter jurisdiction filed by plaintiff City of Aurora ("Aurora") and third-party

defendant Grimm Construction Company, Inc. (doing business as and hereinafter

referred to as "Garney") [Docket No. 149].  Pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(h)(3), the motion requests dismissal of the counterclaim and third-party

claim filed by defendants PS Systems, Inc. and RAR Group, LLC (collectively, the

"patentees").[1]  At a May 6, 2010 hearing in this matter, the Court instructed the parties

that it would construe the motion as both a motion to dismiss under Rule 12(b)(1) and a

motion for summary judgment under Rule 56.

## I.  BACKGROUND

### A.  Brief Factual Background

As the Court summarized in its June 2, 2010 claim construction order, the

patentees are the putative assignees of United States Patent No. 6,840,710 (the "'710

Patent") and United States Patent No. 7,192,218 (the "'218 Patent").  These patents

describe structures and methods to be utilized in the storage of water in artificially

constructed underground reservoirs.  In 2004, the City of Aurora began planning a large

water supply and treatment project known as the Prairie Waters Project.  Under the

project, wells draw water from an aquifer located near the banks of the South Platte

River near Brighton, Colorado.  The water is transported from the wells into a portion of

the project known as the Aquifer Recharge and Recovery facility.  The Aquifer

Recharge and Recovery consists in part of a subterranean wall or walls encircling the

area into which the water is placed.  Water placed in the Aquifer Recharge and

Recovery area is then pumped out and moved off-site for purification, storage, and

eventual use by the residents of Aurora.

---

[1] Although the claim against Garney is more appropriately considered a third-party claim than a counterclaim, for ease of reference going forward, the Court refers to both the third-party claim against Garney and the counterclaim against Aurora as the "counterclaim," which is the way the patentees have labeled it in their pleading. *See* Defs. & Counterclaimants' Answer & Countercl. [Docket No. 55].

In the fall of 2007, after several years of design and preparation, Aurora put the entire Prairie Waters Project out for bid to pre-qualified bidders.  Included in the bid documents for the project were plans, specifications, bid forms, and a proposed contract covering the Aquifer Recharge and Recovery facility.  The invitation to bid and the proposed construction contract for the entire Prairie Waters Project also contained the following statement:

> The City is currently resolving certain legal issues associated with patent claims related to the [Aquifer Recharge and Recovery or] ARR facility. Construction of the project components associated with the ARR will therefore be sequenced to allow the City an opportunity to delete the Bid Form Part C (ARR Site A) and/or Bid Form Part E (LPB) from the project if a satisfactory resolution of these patent issues can not be reached with the patent claimants.  If in the sole judgment of the City such resolution is unfavorable to the City these project components may be eliminated, in whole or in part as best serves the City, from the Work prior to or after award of this contract.

PS Systems, Inc. and RAR Group, LLC's Resp. to Mot. to Dismiss Defs.' Countercl. for Lack of Subject Matter J. [Docket No. 170] ("Patentees' Resp."), ex. A [Docket No. 170-1] at 14 (internal pagination at 1), ex. A [Docket No. 170-2] at 5 (internal pagination at 3); *see also* Patentees' Resp., ex. B (executed construction agreement) [Docket No. 170-5] at 8 (internal pagination 3).

In response to Aurora's invitation to bid, Garney submitted a compliant bid for the Prairie Waters Project, including a proposed price to construct the Aquifer Recharge and Recovery facility.  *See* Patentees' Resp., ex. B [Docket Nos. 170-6, 170-7].  Aurora selected Garney's bid and the two entered into a contract for the entire North Campus facility of the Prairie Waters Project, which includes the Aquifer Recharge and Recovery

unit, on or around March 20, 2008. *See* Patentees' Resp., ex. B [Docket Nos. 170-5, 170-6, 170-7] at 21-23.

According to both the proposed construction agreement contained in the bid documents and the actual signed agreement, "[w]ork on [the Aquifer Recharge and Recovery facility] shall not begin before January 1, 2010. A separate written authorization will be given for this work." Patentees' Resp., ex. A [Docket No. 170-2] at 7 (internal pagination 5); ex. B [Docket No. 170-5] at 10 (internal pagination at 5); *see also* Patentees' Resp., ex. A [Docket No. 170-2] at 10 (internal pagination 8) ("If included in the Work, a separate written authorization for these components will be given on or about January 1, 2010."). The bid documents and the signed construction agreement allow Aurora to eliminate the Aquifer Recharge and Recovery facility from the project and adjust the total contract price accordingly:

> If the City elects to eliminate the work described as Bid Form Part C (ARR Site A) and/or Bid Form Part E (LPB) in accordance with the terms of this Agreement, the price for the portions of the work described as Bid Form Part A (Mobilization and General Project) will be negotiated based on the revised contract time and work required.
>
> If the City elects to eliminate the work described as Bid Form Part C (ARR Site A) and/or Bid Form Part E (LPB) in accordance with the terms of this Agreement, the unit price adjustments described in 7.03.A of this Agreement will not apply to these bid items (C-1 through C-108 and E-1 through E-29).

Patentees' Resp., ex. A [Docket No. 170-2] at 10 (internal pagination 8) ¶¶ D-E.

Construction has begun and been completed on several parts of the Prairie Waters Project. However, construction has not begun on the Aquifer Recharge and Recovery portion of the project. Aurora and its representatives assert that it will not

4

build the Aquifer Recharge and Recovery facility if it is determined in this case that the design would infringe either the '710 Patent or the '218 Patent.

### B. Procedural Background

On November 9, 2007, around the time it began soliciting bids for the entire Prairie Waters Project, Aurora filed this case seeking a declaratory judgment holding that Aurora's planned Aquifer Recharge and Recovery project does not infringe the '710 Patent or the '218 Patent. *See* Compl. for Declaratory J. of Non-Infringement, Invalidity, and Unenforceability [Docket No. 1]. In the alternative, Aurora seeks declarations that the two patents at issue are invalid and/or that the earlier of the two, the '710 Patent, is unenforceable due to inequitable conduct. On January 11, 2008, the patentees filed a motion to dismiss arguing that no justiciable case or controversy existed between them and Aurora because the Prairie Waters Project plans were only preliminary. *See* Defs.' Mot. to Dismiss [Docket No. 7] at 13-14. On September 19, 2008, Judge Wiley Y. Daniel, the district court judge previously assigned to this case, denied patentees' motion to dismiss, concluding that "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *City of Aurora v. PS Sys., Inc.*, No. 07-cv-02371, 2008 WL 4377505, at *11 (D. Colo. Sept. 19, 2008) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Judge Daniel based his decision on the fact that "Aurora asserts that the plans have been finalized, the construction has begun on the Project and there is a definite timetable for the Project to be operational." *City of Aurora*, 2008 WL 4377505, at *10. The day before

5

Judge Daniel issued his ruling, Aurora first provided the patentees with a copy of the construction agreement between it and Garney.

On October 3, 2008, the patentees filed an answer together with a counterclaim against Aurora and Garney [Docket No. 55]. The patentees averred that "Aurora and Garney, both collectively and individually, have been and are infringing the '710 and '218 Patents, either directly, contributorily or by inducing others to infringe the '710 and '218 Patents." Defs. & Counterclaimants' Answer & Countercl. [Docket No. 55] ("Countercl.") at 9 ¶ 23.

On April 12, 2010, Aurora and Garney, believing that the patentees were alleging infringement through the making or using of the patented inventions at issue, brought the present motion as a challenge to the Court's subject-matter jurisdiction. *See* Mot. to Dismiss Defs.' Countercl. for Lack of Subject Matter J. [Docket No. 149] ("Mot. to Dismiss"). In 35 U.S.C. § 271(a), Congress proclaimed that "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Aurora and Garney argue that the patentees lack standing because the allegedly infringing structure has not been built, Aurora has no plans to build it if it indeed infringes, and patentees have not requested declaratory relief.

The patentees conceded that, at the present time, they cannot bring a viable infringement claim based on the making or using of the patented inventions. Instead, the patentees asserted that their infringement claim survives based on 35 U.S.C. § 271(a)'s prohibition on the sale and offering for sale of a patented product and §

271(b)'s prohibition on the inducement of such infringement. According to the patentees' most recent articulation, Garney's bid on the Prairie Water Project, which Aurora accepted, qualifies as a sale or offer for sale of an infringing product. Furthermore, patentees contend that Aurora's invitation for such a bid constituted an inducement of that infringement.

Aurora and Garney's motion to dismiss has merit to the extent that it challenges the patentees' infringement claim based on the making or using of the inventions in the '710 and '218 Patents. Because the parties agree that Aurora has not constructed an infringing structure, there is a standing problem with those theories. In order to show standing, a party must demonstrate three things:

> (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court"; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative."

*In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1101 (10th Cir. 2001) (quoting *Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993)). Here, because neither side now claims that Aurora or Garney made or used an infringing structure, the patentees are unable to allege an injury in fact and, therefore, do not have standing. That claim is dismissed without prejudice.

The patentees' counterclaim for infringement based on theories of sale and offer for sale is based on past events and, as a result, this claim does not present similar

standing problems.  The Court finds Aurora and Garney's challenges more appropriately are read to address the merits of the patentees' claim.  Because of this fact, the Court has concluded that Aurora and Garney's motion, to the extent that it seeks disposition of patentees' sale and offer-for-sale infringement claim, is more properly addressed under the standards of Federal Rule of Civil Procedure 56.  *Cf. Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case.").

The dispositive motion deadline in this case, October 7, 2008, had passed long before Aurora and Garney filed the present motion.  However, because Aurora argued, and the Court agreed, that theories of infringement through sale and offer for sale were not clearly disclosed in the patentees' pleadings and representations in this case, the Court allowed the motion out-of-time.  The Court also permitted the parties to file supplemental briefs on the viability of sale or offer-for-sale theories of infringement. The parties filed these briefs [Docket Nos. 186, 190] and the issue is now suitable for disposition.

## II.  ANALYSIS

In their supplemental brief, Aurora and Garney assert three reasons why they believe summary judgment should be granted in their favor on the patentees' sale and offer-for-sale infringement theories.  *See* Supplemental Br. in Supp. of Countercl.-Defs.' Mot. for Summ. J. of Noninfringement & Lack of Damages [Docket No. 190].  First, they

argue that, based on the undisputed facts, no sale or offer for sale occurred and, therefore, no infringement occurred as a matter of law. Second, they assert that, even if a sale or offer-for-sale could be contemplated under the facts, the patentees have failed to demonstrate a viable theory of damages. Finally, Aurora and Garney claim that they were not given sufficient notice and opportunity to seek discovery on these theories of recovery. The Court addresses each of these questions in turn below.

## A.  The Merits of Patentees' Infringement Claim

As discussed above, under federal patent law, "[e]xcept as otherwise provided in [Title 35 of the United States Code], whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (2006). Furthermore, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b) (2006).

In the patentees' present articulation of their counterclaim against Garney, they argue that Garney's bid and subsequent construction agreement with Aurora represent an infringing offer for sale and sale of the Aquifer Recharge and Recovery facility. The patentees' articulation of their counterclaim against Aurora alleges that Aurora induced Garney's infringement by requesting bids on the Aquifer Recharge and Recovery facility, accepting Garney's bid, and signing the construction agreement.

### 1.  Infringement Through Sale

Because the statute does not define the term "sells" or "sale," the Federal Circuit construes those terms according to their "ordinary meaning." *NTP, Inc. v. Research In*

*Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005). Under this construction, "[t]he definition of 'sale' is: '1. The transfer of property or title for a price. 2. The agreement by which such a transfer takes place.'" *NTP, Inc.*, 418 F.3d at 1319 (quoting Black's Law Dictionary 1337 (7th ed. 1999)). The four elements of a sale are "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *NTP, Inc.*, 418 F.3d at 1319 (quoting Black's Law Dictionary 1337 (7th ed. 1999)).

Patentees contend that the construction agreement between Aurora and Garney fits this definition of a sale:

> First, Aurora and Garney are competent to contract. Second, there has been mutual assent to enter into the Construction Agreement. Third, there is a thing capable of being transferred, namely, the North Campus facility "Work" that is the subject matter of the Construction Agreement, and which includes the infringing technology. . . . Fourth, the parties agreed to a price of $53,350,972.50 for the Work.

Patentees' Resp. at 7-8. Aurora and Garney's response focuses on the second and third elements. Because the Court concludes that the second element – the mutual assent of the parties – is dispositive on the question of whether a sale occurred, the Court focuses on that issue.

The parties do not identify, and the Court is unable to find, Federal Circuit case law discussing the idea of "mutual assent" in the context of an infringing sale. Under general contract law, however, in order to have mutual assent of the parties, acceptance of an offer by the offeree must be complete and unqualified. *See* 1-3 Corbin on Contracts § 3.28 (2010); *see also Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995); *Parry v. Walker*, 657 P.2d 1000, 1002

(Colo. App. 1982) ("It is true that a purported acceptance which adds qualifications or requires performance of conditions is not an acceptance." (citing Restatement (Second) of Contracts § 60));[2] *see also Bogley's Estate v. United States*, 514 F.2d 1027, 1032 (Ct. Cl. 1975); *United States v. Mitchell*, 104 F.2d 343, 346 (8th Cir. 1939). While in many cases an offeree's conditional acceptance is viewed as a counter-offer, *see, e.g.*, Restatement (Second) of Contracts § 59, the rationale for this is based on the requirement that the terms of the offer and the terms of the acceptance be identical. Such considerations are inapplicable to the present case; the putative offer and acceptance contain identical terms.

The issue here is that the construction agreement between Aurora and Garney has a mutually-agreed-upon provision detailing the manner in which eventual acceptance will be afforded – that is, upon Aurora's determination of a "satisfactory resolution" of the present matter. *Cf.* Restatement (Second) of Contracts § 60 ("If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract."). Therefore, although there is no suggestion of a counter-offer, mutual assent of the parties to terms of the agreement having to do with the Aquifer Recharge and Recovery facility is nonetheless in doubt.

The Utah Supreme Court, in somewhat similar circumstances, held that no contract was formed due to a lack of assent. In *Cal Wadsworth Construction v. City of St. George*, the court noted that "[a]n acceptance is a manifestation of assent to an

---

[2] While the actual citation is to Restatement (Second) of Contracts § 60, the Reporter's Note indicates that § 60 was renumbered to what appears to be the section referenced in the case, § 59.

offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." 898 P.2d 1372, 1376 (Utah 1995). The City Council of the City of St. George awarded a contract on condition that the contractor negotiate a reduction in the scope and price of the project. 898 P.2d at 1374. The court held that this condition meant that the city had not assented to the contract. *Cal Wadsworth Construction*, 898 P.2d at 1376-77. Just as the City in *Cal Wadsworth Construction* accepted a bid conditioned on a favorable resolution of a key issue, Aurora accepted Garney's bid to construct the Aquifer Recharge and Recovery facility on the condition that the facility not infringe the patentees' patents.

The facts of the present case differ somewhat from those in *Cal Wadsworth Construction*. For example, there is no indication in the Utah case that the city signed the construction agreement. However, the construction agreement in the present case reiterates the conditional nature of Aurora's acceptance. Another difference is that the construction agreement here speaks in terms of removing the Aquifer Recharge and Recovery component rather than adding it following the satisfactory resolution of the patent issues. In construing the agreement, courts often refuse to "exalt form over substance" in interpreting the impact of contract language. *See, e.g.*, *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998). The apparent effect and intent of the condition in the construction agreement is that the deal regarding the construction of the Aquifer Recharge and Recovery facility would not be consummated until Aurora resolved the patent dispute. Indeed, the highly subjective nature of the provision – "If in the sole judgment of the City such resolution is unfavorable to the City

these project components may be eliminated, in whole or in part as best serves the City, from the Work prior to or after award of this contract" – supports a reading that the parties had not reached a mutual agreement regarding the construction of the Aquifer Recharge and Recovery facility. Therefore, as was the case in *Cal Wadsworth Construction*, without some additional form of acceptance, there is no mutual assent to the portion of Garney's bid that deals with the Aquifer Recharge and Recovery facility.

In coming to this conclusion, the Court disagrees with the patentees that the "satisfactory resolution" of the patent issues surrounding the Aquifer Recharge and Recovery facility stands merely as a condition precedent in an otherwise properly-formed and binding contract. Even under patentees' definition, this condition does not qualify as a typical "condition precedent," whereby some outside event must occur or some third person must act. *See* Patentees' Resp. at 9 ("If parties make a contract under which neither has a duty to perform until the occurrence of some event, such as the raising of a stated amount of capital or the approval of a third person, that event is a condition of the duty of each party. Both parties are bound, although neither will have to perform if the event does not occur." (quoting E. Allan Farnsworth, Contracts § 8.2, at 540-41(1982) (emphasis omitted)). "Conditions precedent," as they are commonly perceived, consist of "those *facts and events, occurring after the making of a valid contract*, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty and before the usual judicial remedies become available." 8-30 Corbin on Contracts § 30.7 (2010) (emphasis in original).

The condition in the construction agreement regarding the "satisfactory resolution" of the patent issues is not a condition to performance. Instead, by requiring

the approval of one of the parties, it is effectively a condition to the mutual assent of the parties regarding the construction of the Aquifer Recharge and Recovery facility. As such, it is a condition to formation of the contract itself. Until the necessary assent is given, neither side can enforce against the other the portion of the construction agreement that deals with the Aquifer Recharge and Recovery facility. Therefore, rather than being a condition to performance – i.e., condition subsequent – the construction agreement contains a condition to assent – i.e., to the formation of the contract. Without formation, there is no contract; without a contract, there is no sale; without a sale, by definition there is no infringement.

Therefore, because the undisputed facts show that there has been no transfer of property or title for a price or an agreement by which such a transfer would take place, *NTP, Inc.*, 418 F.3d at 1319, Garney is entitled to summary judgment on the patentees' counterclaim for infringement based on the sale of an infringing product.

### 2. Infringement Through Offer for Sale

The Federal Circuit has "defined liability for an 'offer to sell' under section 271(a) 'according to the norms of traditional contractual analysis.'" *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (quoting *Rotec Indus. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000)). Under this framework, in order for there to be an "offer for sale," the alleged infringer "must communicate a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *MEMC Elec. Materials, Inc.*, 420 F.3d at 1376 (quoting *Rotec Indus.*, 215

F.3d at 1257 (Fed. Cir. 2000) (quoting Restatement (Second) of Contracts § 24 (1979))) (quotation marks and alteration marks omitted).

Construction bids typically are considered to be offers. *See* 1-2 Corbin on Contracts § 2.3 (2010). Nothing about the present case convinces the Court that Garney's bid should be treated differently. The conditional nature of the bid on the Aquifer Recharge and Recovery facility – that is, it dependence upon Aurora's decision that the patent dispute is satisfactorily resolved – does not make Garney's offer any less real. If Aurora exercises its discretion by finding that the patent dispute has been satisfactorily resolved, Garney's offer will be accepted and the formation of the contract to build the Aquifer Recharge and Recovery facility will be complete. Furthermore, according to the documents, Aurora's acceptance of Garney's bid is left to "the sole judgment of the City" and is dependent on Aurora's perception of whether the resolution is "satisfactory" or "unfavorable." Aurora's broad discretion does not appear to be directly tied to a finding of non-infringement. In other words, under the construction agreement, Aurora could potentially determine that it would be a "satisfactory" or "favorable" resolution to risk proceeding despite infringement. Representations by the Aurora City Council and officials, *see, e.g.*, Supplemental Br. in Supp. of Countercl.-Defs.' Mot. for Summ. J. of Noninfringement and Lack of Damages [Docket No. 188] at 7 (citing exhibits), only prove that their present position is that they will not proceed if the design infringes. Nothing prevents them from changing their minds. Therefore, Garney's bid to construct and deliver the Aquifer Recharge and Recovery facility could potentially infringe the patents at issue in this case as an offer for sale. At the very least, there is a fact question regarding whether Garney's bid communicated a

manifestation of willingness to enter into a bargain, so made as to justify Aurora in understanding that its assent to that bargain is invited and will conclude it. *See MEMC Elec. Materials, Inc.*, 420 F.3d at 1376.

The cases cited by Aurora and Garney do not compel a different result. The courts in both cases – *FieldTurf Int'l, Inc. v. Sprinturf, Inc.*, 433 F.3d 1366, 1370 (Fed. Cir. 2006), and *Natare Corp. v. Aquatic Renovation Sys., Inc.*, 99 F. Supp. 2d 986, 991 (S.D. Ind. 2000) – found that the bids at issue constituted offers for sale. However, the courts in *FieldTurf* and *Natare* found no infringement as a matter of law because the bids did not actually offer an infringing product. *See FieldTurf Int'l*, 433 F.3d at 1370; *Natare Corp.*, 99 F. Supp. 2d at 991. This latter issue proved to be the crux of those opinions.

In the present litigation, issues of infringement remain unresolved. Therefore, the Court is unable say as a matter of law that Garney did not infringe the '710 or the '218 Patents by offering an infringing product for sale. As a consequence, Garney's motion for summary judgment in this regard is denied.

The Court does note, however, that "as a matter of law, an offer to sell a device cannot infringe a method patent without evidence of the device's actual use to carry out the method." *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1352 (Fed. Cir. 2000). The parties have identified Claim 14 of the '710 Patent, a method claim, as being at issue. The patentees have presented no evidence that Aurora or Garney have used any patented device. Garney is entitled to summary judgment on patentees' counterclaim for infringement through sale as it pertains to Claim 14.

### 3. Inducement of Infringement

"In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials, Inc.*, 420 F.3d at 1378 (quoting *Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)) (quotation marks omitted). Therefore, there can be no inducement of infringement in the absence of an underlying direct infringement.

To the extent that the Court dismissed or granted summary judgment on the patentees' underlying claim of infringement against Garney, Aurora is entitled to similar relief on the patentees' claim of inducement. Pursuant to the discussion above, the patentees' claim that Aurora induced infringement by making or using a patented invention is dismissed. Because Garney is entitled to summary judgment on the patentees' direct infringement claim regarding an infringing sale and direct claim regarding the offer for sale of an infringing method, Aurora is entitled to summary judgment on the claim that it induced either of those alleged forms of infringement.

As for the patentees' contention that Aurora induced Garney's infringing offer for sale of other patent claims, the question of an underlying infringement remains unresolved at this point. That, together with the fact that a disputed question of material fact remains as to the second element of inducement – that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement – precludes summary judgment on this claim.

## B. Damages Theory

"Upon a showing of infringement, a patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'" *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010) (quoting 35 U.S.C. § 284 (2006)). "Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." *Lucent Technologies, Inc. v. Gateway*, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

The patentees in the present case do not seek lost-profit damages. They claim instead that they are entitled to a reasonable royalty. While "[l]itigants routinely adopt several approaches for calculating a reasonable royalty," the patentees in the present case have settled on the "more common approach, called the hypothetical negotiation or the 'willing licensor-willing licensee' approach" *Lucent Technologies, Inc.*, 580 F.3d at 1324. Under this approach, "[a] 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc.*, 594 F.3d at 868. Courts typically consult the "comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation [that] appears in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *ResQNet.com, Inc.*, 594 F.3d at 869 (Fed. Cir. 2010).

Aurora and Garney argue that the patentees' claim for damages fails as a matter of law because the patentees have not suffered any damages from the alleged offer for

sale of the patented inventions in the '710 and '218 Patents. "In the Supreme Court's words, awarding damages through litigation attempts to assess 'the difference between the patentee's pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'" *Lucent Technologies, Inc.*, 580 F.3d at 1324 (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552 (1886)) (alteration marks omitted). Patentees have not suggested that there is any difference in their pecuniary condition based simply on Garney's allegedly infringing offer for sale. Nor have they offered evidence supporting a finding on any of the fifteen factors listed in *Georgia-Pacific* as they relate to Garney's allegedly infringing offer for sale. All of the evidence in the record having to do with damages is directed toward those that would be due as a result of the hypothetical construction – i.e, the making and use – of the Aquifer Recharge and Recovery facility. None of it discusses the injury suffered or the royalty that would be due from an offer of sale alone.

"In patent law, the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated." *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990) (citing 5 Chisum on Patents § 20.03[3], at 20-142 (1986)). Once infringement is established, a patentee only bears the burden of proving the *amount* of damages. *Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1406. Offers for sale do not appear to be the type of activity for which a royalty is typically negotiated. *See Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1350 (Fed. Cir. 2000) ("Royalties are ordinarily computed based upon the sales of a patented product or process."). However, it is conceivable that a patentee

would negotiate a fee from a general contractor to allow the general contractor to include a patented invention in a construction bid.  This royalty would compensate the patentee for the interest that the general contractor generates in its own product, which incorporates the patented invention and which, in turn, may decrease interest in the products of a patentee or its licensees.  *Cf. 3D Systems, Inc.*, 160 F.3d at 1379 ("One of the purposes of adding 'offer to sell' to § 271(a) was to prevent . . . generating interest in a potential infringing product to the commercial detriment of the rightful patentee." (alteration marks omitted)).  However, the patentees have offered no evidence to support the calculation of the amount of such a royalty and  "a reasonable royalty analysis requires a court to hypothesize, not to speculate."  *ResQNet.com, Inc.*, 594 F.3d at 869.

Patentees argue that Aurora and Garney are not entitled to summary judgment on the damages question because a reasonable royalty is "the floor below which damages shall not fall."  *Lucent Technologies, Inc.*, 580 F.3d at 1324 (quoting *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983)).  "[T]he district court must award damages in an amount no less than a reasonable royalty."  *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003); *see also Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1406.  Therefore, strictly speaking, once the fact of infringement has been proven, it would be error for a Court to determine that a patentee is not entitled to damages.  *See Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1407; *Dow Chemical Co.*, 341 F.3d at 1382.

That being said, "the district court's obligation to award some amount of damages 'does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284.'" *Dow Chemical Co.*, 341 F.3d at 1382 (quoting *Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1407). "At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). "The burden of proving damages falls on the patentee." *Lucent Technologies, Inc.*, 580 F.3d at 1324.

Therefore, patentees' failure to offer such evidence certainly could impact the Court's determination of the amount of a reasonable royalty. *See Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1406-07. In fact, there is some support for Aurora and Garney's position that, in the absence of any evidence of a reasonable royalty, the Court may award no damages. *See Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981) ("The statute requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute. Even if there is no burden of proof on the party seeking damages in this type of case to come forward with a reasonable royalty, there must at the least be enough evidence in the record to allow the factfinder to formulate a royalty.") (cited by *Lindemann Maschinenfabrik GmbH*, 895 F.2d at 1407). To avoid speculating as to a reasonable royalty, "the trial court must carefully tie proof of damages to the claimed invention's

footprint in the market place. " *ResQNet.com, Inc. v. Lansa*, Inc., 594 F.3d 860, 869
(Fed. Cir. 2010).  In the present case, that means that the Court must be able to
hypothesize, not speculate, what royalty the patentees would negotiate with a general
contractor like Garney for the ability of that general contractor to include the patented
inventions in a construction bid which may or may not be accepted.  Based on the
complete lack of evidence provided thus far, the Court is doubtful that it could engage in
anything but a speculative exercise in determining a reasonable royalty for an offer of
sale that infringes the '710 or '218 Patents.

At the same time, the Court is mindful of the admonishment of the Federal
Circuit that a "reasonable royalty" sets the baseline below which damages may not go.
Therefore, the Court will not grant Garney summary judgment on the question of
damages for Garney's alleged infringing offer for sale until the infringement question is
resolved.

The Court does, however, hold that Aurora and Garney are entitled to a ruling as
a matter of law on one of their damages arguments.  Aurora and Garney argue that the
patentees are not entitled to the same damages under their offer for sale theory that
they would be entitled to if Garney and Aurora had constructed and used an infringing
structure.  Aurora and Garney are correct.  Based on their claim of infringement through
an offer for sale, the patentees would be entitled to only those damages that resulted
from the infringing offer.  *See ResQNet.com, Inc.*, 594 F.3d at 869 ("At all times, the
damages inquiry must concentrate on compensation for the economic harm caused by
infringement of the claimed invention.").  The reasonable royalty patentees seek for the
alleged infringing offer for sale will represent the price, if any, the parties would have

22

negotiated for Garney to include the inventions of the '710 or '218 Patents in its bid.

The Aquifer Recharge and Recovery Facility has not been constructed. Therefore, any

reasonable royalty will not encompass a royalty for the actual construction or use of the

patented inventions in the '710 and '218 Patents. Furthermore, patentees' evidence,

including the report and testimony of Mr. Kleeman, which calculates a reasonable

royalty for the construction and use of the Aquifer Recharge and Recovery, is irrelevant

to the question of damages for an offer for sale of an infringing facility. Therefore, the

patentees may not use the evidence discussed here to establish a reasonable royalty

for Garney's alleged infringement by offer for sale or Aurora's alleged inducement of

that infringement.

### C.  Exclusion of Evidence and Theories of Recovery

The Court's ruling above effectively excludes patentees' damages evidence to

the extent that patentees would use it to establish a reasonable royalty for an infringing

offer for sale. Aurora and Garney also argue that the patentees should be precluded

from asserting a *claim* for infringement through sale or offer for sale because the

patentees did not disclose these theories in a timely manner. Reply in Supp. of Mot. to

Dismiss Defs.' Counterclaim for Lack of Subject Matter Jurisdiction [Docket No. 177] at

9. Because the Court disposed of the infringement-through-sale theory above, the

focus here is limited to the offer-for-sale theory.

Aurora and Garney argue that they were not made aware of the patentees' offer-

for-sale and inducement theories until the parties conferred regarding the present

motion. Patentees contend that their counterclaim, together with the course of

discovery in this case, put Aurora and Garney on notice of these theories of

infringement.  In support of their contention, patentees cite the following factual

averments in their counterclaim complaint:

> Upon information and belief, Aurora solicited construction bids for the
> underground reservoir in November, 2007, including a bid from Garney.
>
> On or about March 20, 2008, Aurora and Garney entered into a written
> Construction Agreement to build the underground reservoir.  Aurora
> produced a copy of the written Construction Agreement to PS Systems on
> or about September 18, 2008.  The construction price is $53,350,972.50[.]
>
> Despite Aurora and Garney's knowledge of the '710 and '218 Patents,
> and in derogation of the rights of PS Systems, Aurora solicited bids for
> construction of the underground reservoir, Garney submitted a bid for
> construction of the underground reservoir, Aurora and Garney entered
> into the Construction Agreement, and Aurora and Garney have
> commenced construction.  Therefore, Aurora and Garney actions are
> willful.

Countercl. at 8-9 ¶¶ 13, 14, 19; *see* Patentees' Resp. at 5.  Patentees then claimed that

"[b]y their actions alleged above, Aurora and Garney, both collectively and individually,

have been and are infringing the '710 and '218 Patents, either directly, contributorily or

by inducing others to infringe the '710 and '218 Patents."  Countercl. at 9 ¶ 23.

However, several of the patentees' averments indicate that this broad language

refers instead to the using or making of an allegedly infringing device.  For example,

patentees state that "Aurora is currently constructing the Prairie Waters Project, which

includes an underground reservoir and related infrastructure (collectively 'underground

reservoir.')"  Countercl. at 7-8 ¶ 12.  The references to damages in the patentees'

complaint also appear to assume infringement through construction of the Aquifer

Recharge and Recovery facility:

> Upon information and belief, the minimum construction cost savings alone
> to Aurora of building the underground reservoir according to PS Systems'
> patented technologies is approximately $50 million.

24

> The Prairie Waters Project, of which the underground reservoir is a component, will result in significant financial benefits and/or cost savings to Aurora. Aurora claims on its project website that "the Prairie Waters Project will capture water rights the city already owns that are worth more than $300 million, which means we will not need to acquire resources from other water rights holders, saving the city money."
>
> Under a 25 to 33% of cost savings "rule of thumb" analysis, a reasonable royalty in this case may be at least $75 million to $100 million.

Countercl. at 8-9 ¶¶ 15, 16, 20.

The final pretrial order, which supersedes all other pleadings, does not provide any clearer indications regarding the theories underlying the patentees' claim of infringement. In describing the patentees' claim, the final pretrial order states that patentees "assert a counterclaim for patent infringement that [Aurora and Garney] ha[ve] willfully infringed the '710 and '218 Patents by direct infringement under 35 U.S.C. § 271(a), actively inducing infringement under 35 U.S.C. § 271(b), and/or by contributory infringement under 35 U.S.C. § 271(c)." Final Pretrial Order [Docket No. 110] at 5.

The language in patentees' counterclaim complaint and in the final pretrial order is a broad, scattershot recitation of the legal bases for a wide array of infringement claims. Not only does the language fail to indicate which claim or claims it brings against which party, it also specifically alleges infractions of which no party is presently accused, for example, contributory infringement under 35 U.S.C. § 271(c). The averred facts do not provide a clear indication either; the words "offer," "sale," or "sell" do not appear anywhere in the patentees' counterclaim complaint. That being said, and despite the fact that the patentees' factual averments and descriptions of their claim are ambiguous, the allegations nonetheless encompass theories of infringement by offer for

sale and the inducement thereof. Thus, the counterclaim provides enough notice of an infringement theory based on an offer for sale and inducement of that offer that the Court may not dismiss the counterclaim based solely upon the patentees' pleading. Therefore, the patentees may proceed under these theories unless Aurora and Garney are correct that the patentees' discovery responses should preclude such a claim.

After the patentees filed their counterclaim, the parties engaged in additional discovery. That discovery was limited to the issue of damages. The patentees claim that their disclosures during this limited additional discovery put Aurora and Garney on notice of the offer-for-sale theory of infringement. The Court disagrees. For example, the patentees' second supplemental Rule 26(a)(1) disclosures asserted damages in the form of a reasonable royalty for infringement in the amount of $89,349,000, an additional $178,698,000 in treble damages, and undetermined attorneys' fees, costs, and interest. *See* Mot. to Dismiss, ex. D at 2-3. According to that disclosure, the enumerated damages figures were based on the expert report of Robert Kleeman. The disclosure tracked Mr. Kleeman's report and disclosed damages in three categories: (1) "damages due to the [Aquifer Recharge and Recovery] Construction"; (2) "damages related to the cost saving of not building a reverse osmosis facility"; and (3) "damages related to ongoing savings." *See* Mot. to Dismiss, ex. D at 2-3. The disclosure makes no reference to a reasonable royalty due to an infringing offer for sale generally or, more specifically, to the amount Garney would have had to pay in order to include the patented inventions in its bid on the Aquifer Recharge and Recovery unit.

The report upon which patentees based their Rule 26(a)(1) disclosures and the deposition testimony of the report's author, Mr. Kleeman, do not advance the patentees'

argument that they disclosed the offer for sale theory and the damages related to it.  As

the patentees describe it, they

> served [their] expert report on damages on March 31, 2009.  Mr. Robert
> Kleeman calculated a reasonable royalty as of the date infringement
> began pursuant to a hypothetical negotiation between the patent owner
> and the infringer. [Patentees' Resp., ex. D].  Before serving a rebuttal
> expert report on damages, Aurora and Garney took Mr. Kleeman's
> deposition, where he stated that the [sic] he assumed that the date of
> infringement, and therefore the date of the hypothetical negotiation was,
> at the earliest, the date Aurora solicited the infringing bids (November,
> 2007), but no later than the date of the Construction Agreement (March
> 20, 2008). (Ex. H, pp. 157-59).

Patentees' Resp. at 13-14.

Nothing in Mr. Kleeman's report addresses Aurora and Garney's argument that

the patentees failed to disclose their offer for sale theory of recovery.  The Kleeman

report contains the following preface:

> We have been asked to provide an opinion of what the appropriate royalty
> base and rate would be.  In arriving at our conclusions, we have assumed
> that the patents in question are valid, and that the City of Aurora and
> Garney, as part of the Prairie Waters Project, are infringing on those
> patents.  We are not experts on either of these issues, and therefore, this
> report relies on these assumptions and they are not addressed in this
> report.

Patentees' Resp. ex. D at 5 (internal pagination at 1).

In describing the nature and amount of damages, Mr. Kleeman does not

calculate the damages based on an offer for sale.  Instead the report identifies only two

types of damages:

> [i]t is our opinion that there are two distinct benefit streams that should be
> reviewed to determine the base benefit stream that a reasonable royalty
> would be applied to.  These two benefit streams are Cost Savings, both at
> the beginning of the project, as well as the continued operation of the
> enterprise, and operating income of the enterprise over the course of the
> infringement.

Patentees' Resp. ex. D at 6 (internal pagination at 2). Regarding the former, Mr.

Kleeman states that "PS Systems has alleged that the ARR portion of the system being

used for the Prairie Waters Project infringes on the patents held by PS Systems.

Specifically, PS Systems has alleged that the *construction* of the underground reservoir

is an infringement of the patents." Patentees' Resp. ex. D at 7 (internal pagination at 3)

(emphasis added). Therefore, rather than revealing an offer for sale theory of

infringement, Mr. Kleeman's report reinforces Aurora and Garney's perception that the

patentees' claim was based on theories of infringement through the using or making of

the patented technology.

Mr. Kleeman's deposition testimony is somewhat less tied to the actual

construction of an infringing structure. When asked when he thought the infringement

occurred, Mr. Kleeman responded that "the moment they signed the contract with

Garney, . . . the City gained the benefit of the bargain." Patentees' Resp., ex. H at 8

(internal pagination at 158 ll. 4-6). When asked the same question later, Mr. Kleeman

first made clear that he was not qualified to opine as to what constituted infringement.

He then explained that for purposes of his damages calculation he assumed an

infringement on

> either of two dates, the date that the City put the bids out specifying the
> infringing technology, that would be the earliest date in my opinion, but no
> later than the date the contract was signed because at that time they had
> reached a deal, again with my hypothetical, what it is infringing, at the
> date of the contract signing the infringement takes place and the benefit to
> the City becomes immediate.

Patentees' Resp., ex. H at 9 ll. 15-22). Based on this excerpt of Mr. Kleeman's

testimony, it could be inferred that the patentees' theory of recovery was based on an

act prior to the construction of the Aquifer Recharge and Recovery facility.  However, even this generous reading only suggests infringement by sale; it does not hint at a theory of infringement through Garney's alleged offer of sale.  As evidence of this, Mr. Kleeman only discusses a benefit to Aurora, not a benefit to the alleged offeror and infringer, Garney.

The patentees' reading of Mr. Kleeman's deposition testimony is at odds with the statements and the reasoning in his report.  As discussed above, the report assumed that the infringement consisted of "the construction of the underground reservoir . . . ."  Patentees' Resp. ex. D at 7 (internal pagination at 3); *see also* Patentees' Resp. ex. D at 12 (internal pagination at 8) ("The technology provides several advantages to [Aurora].  The first is in initial cost savings on the construction of portions of the system.").  More importantly, the damage calculation assumes a royalty based on construction, not based on an offer for sale.  In discussing the calculation of the rate of damages, Mr. Kleeman explained that "[i]t is our opinion that the overall royalty rates that would be negotiated related to the patented technology would fall into three distinct categories: The cost savings related to the construction of the ARR, the construction cost savings related to the production of a reverse osmosis facility, and the long term cost savings related to not operating a reverse osmosis facility as part of the Prairie Waters Project."  Patentees' Resp. ex. D at 17 (internal pagination at 13); *see also* Patentees' Resp. ex. D at 18-19 (internal pagination at 14-15).  There is no indication in his report or elsewhere how any of these considerations would work into a negotiation to include the patented technology in a general contractor's bid.  The royalty amounts suggested by Mr. Kleeman – $15,174,000, $50,000,000, and $24,175,000 – also

suggest a royalty for use of the patented technology, not for the offering for sale of that technology in a bid or offer which may or may not be accepted by the offeree.

The patentees also rely on their disclosures surrounding their technical expert, Christopher Lidstone. The patentees explain that they provided his "expert report opining that Aurora's proposed system infringed both patents and furnished a detailed, technical claim chart that demonstrated infringement on an element-by-element basis." Patentees' Resp. at 13 (citing Patentees' Resp., ex. G ¶ 5.1 & Att. F). The patentees then note that "Aurora deposed Mr. Lidstone," Patentees' Resp. at 13, the inference being that the Lidstone report put Aurora and Garney on some sort of notice regarding patentees' infringement theories, but Aurora and Garney chose not to pursue the issue further. However, the cited portions of the Lidstone report give no such notice. Instead, they rebut an opposing expert's opinion that the Aquifer Recharge and Recovery facility, if built, would not infringe the '710 or '218 Patents. Lidstone makes no reference to the potential form of infringement, i.e., the making, using, selling, offering for sale, or importing the patented invention. Therefore, the Lidstone report did not serve as notice of a theory of damages or infringement based on an offer for sale and the inducement of that offer.

The patentees also suggest that the circumstances surrounding the filing of their counterclaim serve as a sufficient indication that they were challenging an offer for sale. The patentees contend that in their motion to dismiss and their interrogatory responses prior to their counterclaim they argued that no infringement based on construction had occurred. *See* Patentees' Resp. at 13. The patentees claim that "[u]pon learning of their infringement, PS Systems immediately counterclaimed against Aurora and

30

Garney," Patentees' Resp. at 2, the implication being that Aurora and Garney should have known that the patentees did not allege infringing use or construction, but rather complained of the recently disclosed agreement.

It is true that patentees stated in a May 30, 2008 interrogatory response that "[o]n information and belief, and according to Plaintiff's complaint, Plaintiff has not yet built any apparatus or practiced any method that would infringe any claim of the '710 Patent." Patentees' Resp., ex. F [Docket No. 170-11] at 3 (internal pagination at 2). Based on this belief, the patentees "therefore moved to dismiss Plaintiff's complaint" arguing that there was no justiciable controversy. Patentees' Resp., ex. F [Docket No. 170-11] at 3 (internal pagination at 2) (referring to Defs.' Mot. to Dismiss [Docket No. 7]. It is also true that on September 18, 2008, the patentees first received evidence that Aurora and Garney signed a construction agreement.

However, the patentees neglect to mention an important event that occurred at that same time. On September 19, 2008, the Court denied patentees' motion to dismiss, based in part on the fact that "the plans have been finalized, the construction has begun on the Project and there is a definite timetable for the Project to be operational." *City of Aurora*, 2008 WL 4377505, at *10. The patentees filed their answer and counterclaim complaint on October 3, 2008, the date they were required to filed a responsive pleading to Aurora's complaint under the Federal Rules of Civil Procedure.

Patentees suggest that Aurora and Garney should have deduced from this course of events that the patentees' infringement claim was based on an alleged sale and offer for sale. The Court disagrees. Aurora first put the Prairie Waters Project out

31

to bid and filed its complaint in November 2007. Aurora stated as much in a January 31, 2008 response to the patentees' aforementioned motion to dismiss. In that same response, Aurora further explained that it intended to award the contract for the Aquifer Recharge and Recovery unit in February 2008. *See* Pl.'s Resp. to Mot. to Dismiss [Docket No. 18] at 2-3. On March of that year, it did so. Despite these facts, on May 30, 2008, in responding to Aurora's interrogatories, the patentees stated that they believed that no infringement had occurred because nothing had been built yet. The patentees made no mention of an infringing sale or offer for sale or inducement of either. In fact, even after they received a copy of the construction agreement which discussed the Aquifer Recharge and Recovery system, the patentees cannot cite to a single instance in which they used the words "offer," "sell," or "sale" in describing Aurora's or Garney's infringing acts.

While the Court concludes that the patentees' counterclaim can be read broadly to allege offer-for-sale infringement by Garney and inducement of that infringement by Aurora, the patentees' disclosures since the filing of their counterclaim have effectively narrowed its scope. Moreover, patentees have failed to provide disclosure of their experts' opinions in that regard. In short, the patentees' failure to disclose the fact that they sought damages for an infringing offer for sale led Aurora and Garney to believe that the broad counterclaim language did not encompass an offer for sale and inducement thereof.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless." Fed. R. Civ. P. 37(c)(1). "This sanction is mandatory unless the non-disclosing party shows a substantial justification or that the failure to disclose was harmless." *Cook v. Rockwell*, 233 F.R.D. 598, 600 (D. Colo. 2005). The patentees have not shown any justification for their failure to disclose the bases of their offer for sale and inducement theories. Furthermore, far from being harmless, allowing any such undisclosed evidence to be used at trial would greatly prejudice Aurora and Garney. Trial is two weeks away and the patentees still have not disclosed the basis for a damages calculation relating to an offer for sale.[3]

Furthermore, in addition to sanctioning the patentees by excluding damages evidence, the Court has the authority, based on Aurora and Garney's motion, *see* Mot. to Dismiss at 9, to impose additional sanctions for a party's failure to disclose materials covered by Rules 26(a) and (e). Fed. R. Civ. P. 37(c)(1). Some of those additional sanctions are enumerated in Rule 37(b)(2)(A)(i) through (vi). *See* Fed. R. Civ. P. 37(c)(1)(C). Rule 37(b)(2)(A)(ii) permits the Court to sanction delinquent parties by "prohibiting [them] from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."

Because the result of patentees' failure to disclose a basis for offer-for-sale damages was to lead Aurora and Garney to believe that such a claim was not at issue in this case, the Court is justified in precluding all evidence related to an offer-for-sale claim of infringement pursuant to Federal Rule of Civil Procedure 37(c)(1) and

---

[3] At a June 16, 2010 hearing the Court granted on similar grounds patentees' motion [Docket No. 146] to exclude as untimely a number of examples of prior art disclosed by Aurora [Docket No. 224].

37(b)(2)(A)(ii).  By doing so, the Court is essentially precluding the patentees from pursuing their counterclaim for offer-for-sale infringement and for inducement of that offer.  The Court also finds that, because Aurora and Garney reasonably believed that they did not face an infringement claim based on an offer for sale, it is also appropriate to consider striking or dismissing the counterclaim.  *See* Fed. R. Civ. P. 37(b)(2)(A)(iii) & (v).

"A decision to sanction a litigant pursuant to Fed. R. Civ. P. 37 is one that is not unique to patent law and we therefore apply regional circuit law to that issue." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291, 1304 (Fed. Cir. 2009) (quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002) (omission marks omitted).  In the Tenth Circuit, in deciding whether to dismiss a case or claim as a sanction under Rule 37(b), a court must apply the five factors set out in *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992).  *See Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1179 (10th Cir. 2009).  These factors include: (1) the amount of actual prejudice to the opposing party; (2) the degree of interference with the judicial process; (3) the litigant's culpability; (4) whether the litigant was warned in advance that dismissal was a likely sanction; and (5) whether a lesser sanction would be effective.  *Ehrenhaus*, 965 F.2d at 921.

The amount of actual prejudice to Aurora and Garney from having to defend against patentees' offer-for-sale infringement claim would be substantial.  This case has been litigated for nearly three years.  Trial is set to begin in two weeks.  Aurora and Garney would not have sufficient time before trial to prepare a defense against such a

claim.  The only other choice would be to continue the trial.  Although Aurora and Garney appear to prefer a continuance over having to proceed to trial unprepared, the patentees have repeatedly stated that they do not want the trial to be continued. Neither does the Court; resetting this ten-day trial would interfere with other trials and other matters before the Court.  Therefore, the first two factors weigh in favor of dismissal of the patentees' counterclaim for infringement by an offer-for-sale and the inducement of that offer.

As for the question of litigant's culpability, this factor also leans in favor of dismissal of the patentees' counterclaim.  The patentees did not raise this theory until they were faced with dismissal of their claim for infringement from the making or using a patented invention.  It appears that once the patentees discovered that their previous theories were flawed, they attempted, at the last moment, to shift gears and change theories.  The patentees' failure to anticipate this result is no one's fault but their own.

Turning to the fourth factor, the only warning that the patentees received that this claim might be dismissed came in Aurora and Garney's present motion to dismiss. Although this does not constitute much advance warning, the blame for this fact rests on the patentees and their late disclosure.  No litigant can expect that a late-disclosed theory will be admitted at trial.  Finally, no lesser sanction would be effective.  In fact, as the Court explained previously, most lesser sanctions such as excluding evidence would have the same ultimate effect: precluding the patentees from proceeding with their counterclaim.  The only other alternative, continuance, is not effective as a sanction and otherwise fails to serve the interests of the parties and the Court.

## III. CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that the City of Aurora and Garney Construction's combined motion to dismiss and motion for summary judgment [Docket No. 149] is GRANTED as follows:

PS Systems, Inc. and RAR Group, LLC's counterclaim and third-party claim for direct and indirect infringement of the '710 and '218 Patents through the using or making of an infringing invention is DISMISSED without prejudice for lack of subject-matter jurisdiction;

The City of Aurora and Garney Construction are entitled to summary judgment on PS Systems, Inc. and RAR Group, LLC's counterclaim and third-party claim for direct and indirect infringement of the '710 and '218 Patents through the sale of an infringing invention;

The City of Aurora and Garney Construction are entitled to summary judgment on PS Systems, Inc. and RAR Group, LLC's counterclaim and third-party claim for direct and indirect infringement of Claim 14 of the '710 Patent through the offering for sale of an infringing invention;

As a sanction pursuant to Federal Rule of Civil Procedure 37(c)(1) and 37(b)(2)(A)(iii) & (v), patentees' claim that Garney infringed the '710 or '218 Patents by offering for sale an infringing product and that Aurora induced that infringement, is DISMISSED;

The motion is DENIED in all other respects.  It is further

**ORDERED** that any Final Judgment entered upon resolution of all claims against all parties shall reflect the rulings in this order.

DATED June 25, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge